**UNITED STATES of America ex rel. Harvey A. MARCELIN, Petitioner-Appellant,**

v.

**Vincent MANCUSI, Superintendent of Attica State Prison, Attica, New York, Respondent-Appellee.**

**No. 419, Docket 71–1974.**

United States Court of Appeals, Second Circuit.

Argued Jan. 12, 1972.

Decided May 22, 1972.

Steven B. Rosenfeld, New York City, for petitioner-appellant.

Burton Herman, Asst. Atty. Gen. of N. Y., New York City (Louis J. Lefkowitz, Atty. Gen. of N. Y., and Samuel A. Hirschowitz, First Asst. Atty. Gen. of N. Y., New York City, on the brief), for respondent-appellee.

Before MEDINA, KAUFMAN and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

The essential issue raised on this appeal is whether petitioner, presently incarcerated at Attica State Prison, was denied his Sixth Amendment right to the effective assistance of counsel[1] at his trial for first degree murder in the New York Supreme Court, New York County, in 1963; more specifically, whether his counsel, under all the circumstances, failed to make an adequate investigation to determine whether there was a basis upon which to interpose a defense that petitioner was legally insane at the time of the commission of the crime. After a four day evidentiary hearing in the Southern District of New York, before Charles M. Metzner, *District Judge,* on petitioner's fifth petition in the federal courts[2] for a writ of habeas corpus, Judge Metzner filed a reasoned opinion denying the petition. For the reasons stated below, we agree with Judge Metzner's conclusions in all respects, including his holding that peti-

tioner was not denied his constitutional right to the effective assistance of counsel. We affirm.

I.

At the first phase of petitioner's state court trial before Justice Thomas Dickens, which resulted in a jury verdict on October 16, 1963 of first degree murder, there was eye witness testimony that, on April 18, 1963, petitioner, using a loaded .32 caliber revolver he had brought to an apartment located at 2216 Eighth Avenue, Manhattan, shot one Jacqueline Bonds in the public hallway, after which she ran into a bedroom where he shot her again. She staggered into the living room where she collapsed and died. Three bullet wounds were found in her body. There also was evidence that about six weeks before the shooting, when Jacqueline in the presence of her mother told petitioner that she was not going to go with him any more, petitioner pointed his finger at Jacqueline and said, "I'll get you!"[3]

At the second phase of petitioner's murder trial, the purpose of which was to determine whether a sentence of death or life imprisonment should be imposed, there was evidence that petitioner had been indicted on April 5, 1963 by a grand jury in Brooklyn for certain crimes which he was charged with having committed on March 14, 1963 involving one Clementine Benifield, namely,

---

1. Made applicable to the states by the Fourteenth Amendment. Powell v. Alabama, 287 U.S. 45 (1932). See Gideon v. Wainwright, 372 U.S. 335 (1963).

2. Marcelin's previous petitions for writs of habeas corpus were denied in the Northern District of New York by Judge Brennan on November 24, 1965, February 3, 1966 and April 13, 1966; and by Judge Port on August 19, 1966. The first three petitions were denied for failure to exhaust state remedies. The fourth petition was denied on the same ground and, alternatively, on the merits; one of the claims in the fourth petition was that he was denied the effective assistance of counsel (but not on the ground of failure to interpose a defense of legal insanity). On January 4, 1968, an order

was entered in this Court (Lumbard, *C. J.*) permitting withdrawal of petitioner's appeal from Judge Port's order "without prejudice to renew the petition in the United States District Court". The petition was renewed in the form of the fifth petition, from the denial of which by Judge Metzner the instant appeal has been taken.

3. Of course there was considerably more evidence during the first phase of petitioner's 16 day murder trial, as well as during the second phase, than we refer to in this opinion. What we have briefly stated is believed sufficient for an understanding of the essential issue raised on this appeal and to which this opinion is addressed.

attempted first degree rape, second degree assault and second degree burglary. In connection with the grand jury's continuing investigation of that case, the assistant district attorney, at the request of petitioner who claimed he had been with Jacqueline Bonds at the time of the alleged crimes committed on March 14, had subpoenaed Jacqueline to appear before the grand jury as an alibi witness on April 18, 1963. She did not appear pursuant to the subpoena and never did testify before the grand jury. Petitioner, however, was at the grand jury on April 18. The upshot of the second phase of petitioner's murder trial was that, when the jury was unable to reach an agreement, Justice Dickens on November 20, 1963 imposed the mandatory sentence of life imprisonment.[4]

The petition for a writ of habeas corpus from the denial of which the instant appeal arises was filed in the Southern District of New York on December 26, 1968. Judge Metzner in an opinion and order of April 28, 1969 initially denied the petition without a hearing on the ground that, of the four claims presented, petitioner had failed to exhaust state remedies with respect to his claim of legal insanity at the time of commission of the crime and at the time of trial; and this unexhausted claim was related to two of the exhausted claims, namely, ineffective assistance of counsel and threats by the prosecutor. See United States ex rel. Annunziato v. Deegan, 440 F.2d 304, 305 n. 1 (2 Cir. 1971) ; United States ex rel. Levy v. McMann, 394 F.2d 402 (2 Cir. 1968) ; United States ex rel. Sniffen v. Follette, 393 F.2d 726 (2 Cir. 1968). Accordingly, Judge Metzner denied the petition "without prejudice to a renewal after exhaustion of state remedies on the claim of insanity."

Our Court, on August 12, 1969, granted petitioner's motion for a certificate of probable cause, remanded the case to the district court for a hearing on the merits of petitioner's unresolved claims and suggested that the district court assign counsel to petitioner. Judge Metzner did appoint counsel to represent petitioner and also appointed a psychiatrist to examine petitioner and to testify at the hearing. Both have served without compensation. A four day evidentiary hearing was held. All of petitioner's claims were considered. On June 28, 1971, Judge Metzner filed his opinion denying the petition. The instant appeal followed.

## II.

Against this background of proceedings involving petitioner in the state and federal courts during the past nine years, we turn directly to the one question raised on this appeal which merits discussion: Did the alleged failure of petitioner's state court appointed counsel to make an adequate investigation to de-

4. The Appellate Division on June 15, 1965 affirmed the conviction. People v. Marcelin, 23 App.Div.2d 368, 260 N.Y.S.2d 560 (1st Dept. 1965). Leave to appeal was denied by the New York Court of Appeals on October 18, 1965.

A petition for an order to show cause, which the Appellate Division treated as a petition for habeas corpus, was denied on October 5, 1965. People ex rel. Marcelin v. Attorney General, 24 App.Div.2d 771, 263 N.Y.S.2d 314 (3rd Dept. 1965).

Appellant's first petition for a writ of error coram nobis, in which he alleged inadequacy of counsel, was denied by Justice Dickens on June 16, 1966. The Appellate Division on October 3, 1967 affirmed. People v. Marcelin, 28 App. Div.2d 1094, 283 N.Y.S.2d 848 (1st Dept. 1967). Leave to appeal was denied by

the New York Court of Appeals on February 2, 1968. The United States Supreme Court denied certiorari on October 14, 1968. Marcelin v. New York, 393 U.S. 871 (1968).

Appellant's second petition for a writ of error coram nobis, in which he alleged that he was legally insane at the time of commission of the crime, was denied by Justice Dickens on October 18, 1968. The Appellate Division on February 10, 1970 affirmed. People v. Marcelin, 33 App.Div.2d 1106, 308 N.Y.S. 2d 289 (1st Dept. 1970). Leave to appeal was denied by the New York Court of Appeals on March 12, 1970.

Petitioner has exhausted his state remedies with respect to the issues raised on the instant appeal.

termine whether there was a basis upon which to interpose a defense that petitioner was legally insane at the time of the commission of the crime, under all the circumstances, amount to a failure of constitutional magnitude, i. e. was petitioner denied his constitutional right to the effective assistance of counsel?

First, we shall briefly summarize the facts relevant to this issue.

Petitioner was represented throughout his state court trial by two court appointed attorneys: Otto F. Fusco, Esq. and Herman Postel, Esq. (both of whom testified at the habeas corpus hearing in the district court). Postel was appointed on May 7, 1963, at about the time the indictment was returned, and served continuously throughout proceedings in the trial court. Fusco was appointed on September 11, 1963, one week before the trial began, and served throughout the trial.[5]

Relations between petitioner and his counsel involved an almost total refusal on the part of petitioner to cooperate with—indeed even to communicate with—his counsel. This was true of the 4½ month pre-trial period as well as the 2 month period over which both phases of the trial extended. Judge Metzner found, based on substantial evidence, that "all petitioner ever would say was

that 'he didn't do it.' "[6] Counsel enlisted the help of petitioner's mother and a neighbor who was a goddaughter of petitioner's mother, both of whom attended the trial. At counsel's request, these two ladies conferred with petitioner, urging him to open up and talk with his lawyers. He refused.

This difficulty encountered by counsel in trying to communicate with their client led to two separate court ordered psychiatric examinations of petitioner at the request of his counsel.[7]

In August 1963, petitioner's court appointed counsel (Attorney Postel) moved to have petitioner committed to Bellevue for a mental examination to determine whether he was competent to stand trial. Counsel stated in his application that "[Petitioner] has exhibited no willingness to either cooperate or to help in the preparation of his defense." The court granted the motion and ordered that petitioner be transferred to Bellevue where he remained for 6 weeks. In due course a report by three Bellevue psychiatrists was rendered to the court and counsel. It concluded that petitioner was without pyschosis, although he was possessed of "schizoid personality with sociopathic features". It also concluded that petitioner was competent to stand trial.

---

5. Two other court appointed attorneys represented petitioner briefly as follows: Leonard Sandler, Esq. was appointed with Postel on May 7, 1963. Sandler was relieved on May 28. Edward H. Levine, Esq. was appointed to replace him by an order signed on June 7. Levine in turn was relieved on September 11. He was replaced on that date by Fusco.

Petitioner at all times was represented by two attorneys. Fusco and Postel, however, were his trial counsel; and, of the two, Fusco was chief trial counsel, Postel his assistant. Both Fusco and Postel had had extensive previous criminal defense experience, including the representation of defendants in capital cases.

6. Attorney Fusco testified before Judge Metzner that the sum total of what petitioner ever told him was, "All I am going to tell you is that I didn't do it, and that's it." This was petitioner's initial position taken with Fusco on the day

the latter was appointed, when they conferred "for approximately a half-hour or an hour." It continued during the week required to select a jury, during the course of which Fusco "was always attempting to talk to this defendant." And it continued throughout the trial.

7. Petitioner's counsel also knew of a third and earlier routine psychiatric examination of him which had been made by doctors of the Department of Correction in connection with the charge of attempted rape for which petitioner had been indicted by a Brooklyn grand jury on April 5, 1963, referred to above. The results of this examination were furnished to the court and petitioner's appointed counsel in the instant case at about the time of his arraignment on the first degree murder indictment in early May 1963. The report showed petitioner to be without psychosis.

During the course of the trial itself, Attorney Fusco informed the court of his inability to communicate with his client and requested the court to appoint an independent psychiatrist to examine petitioner, again to determine his competence to stand trial.[8] The court made the appointment. Petitioner again was examined on October 11, 1963 by another psychiatrist who reported to the court and counsel that "[Petitioner] is not incapable of making his defense should he choose to communicate with those responsible for it."

We mention the psychiatric examinations of August and October 1963 not in connection with the issue of whether petitioner was competent to stand trial. Clearly they established that he was competent in that respect. But that is not the issue to which this opinion is addressed.[9] We refer to these psychiatric examinations of which petitioner's counsel *were aware* for their bearing upon the central fact upon which petitioner's claim of ineffective assistance of counsel turns, namely, the psychiatric examination of petitioner at Bellevue in April 1962, one year before the instant offense—a pyschiatric examination of which petitioner's counsel *were not aware* during their representation of petitioner. And of course it is the issue of petitioner's mental competence at the time of the commission of the crime to which the April 1962 Bellevue admission is claimed to be relevant.

Petitioner's admission to Bellevue on April 9, 1962 was voluntary. He was discharged in the custody of his wife on April 16 after one week of hospitalization. The examining psychiatrist found that with medication petitioner had done very well. He also found that petitioner was not psychotic. The hospital record does contain the phrases "delusional grandiosity", "suggestions of chronic schizophrenia" and "paranoid reaction personality".

On the basis of this April 1962 hospital record, Dr. George Hamilton Wilke, the psychiatrist appointed by Judge Metzner in the habeas corpus proceeding below, testified, based on petitioner's psychiatric history "not previously presented", that "a possibility of insanity can be entertained". Dr. Wilke also testified, based on his examination of petitioner, that he was not mentally incompetent at the time of the hearing before Judge Metzner, although he found him to be a schizoid person with poor impulse control and suspicious ideation. And, finally, Dr. Wilke testified that, equating "psychotic" with the legal definition of mental incompetence to commit a crime, he had no opinion one way or the other as to whether petitioner was psychotic at the time of the commission of the crime.

Judge Metzner found, based on substantial evidence believed by him to be credible, that petitioner's counsel "did not know of the 1962 hospital admission." [10]

8. The record shows that Attorney Fusco at this stage of the trial also was concerned about two other aspects of his inability to communicate with petitioner. First, contrary to Fusco's advice that he take the witness stand on his own behalf, petitioner adamantly refused to do so. Second, in view of the overwhelming strength of the people's case, Fusco recommended that petitioner accept the district attorney's offer to permit him to plead to second degree murder, but again petitioner adamantly refused to follow his attorney's advice.

9. On the issue of petitioner's competence to stand trial, Judge Metzner stated in his opinion below:

"I gather from petitioner's post-trial brief that the claim of mental incapacity at the time of trial is no longer being urged upon the court. It is clear from the medical and other evidence that has been presented to this court that the claim could not succeed."

10. The only evidence to the contrary was petitioner's "bare assertions" before Judge Metzner that he told both of his attorneys about his 1962 admission to Bellevue. Both counsel denied that any such information was given them.

There was a similar conflict between petitioner's testimony before Judge Metzner that he had told his attorneys about his psychiatric examination in 1952 at

### III.

In the light of the foregoing, we now turn to the controlling legal standards and their application to the facts of record before us in order to determine whether petitioner has been denied his constitutional right to the effective assistance of counsel.

■ The burden of proof of course is on petitioner to sustain the allegations of his habeas corpus petition, including the specific claim here under consideration. As to this—the alleged inadequacy of counsel—we have established independently stringent requirements and uniformly have adhered to them. United States ex rel. Crispin v. Mancusi, 448 F.2d 233, 237 (2 Cir.), cert. denied, 404 U.S. 967 (1971); United States ex rel. Scott v. Mancusi, 429 F.2d 104, 109 (2 Cir. 1970), cert. denied, 402 U.S. 909 (1971); United States v. Katz, 425 F.2d 928, 930–31 (2 Cir. 1970); United States v. Silva, 418 F.2d 328, 331–32 (2 Cir. 1969); United States v. Currier, 405 F.2d 1039, 1042–43 (2 Cir.), cert. denied, 395 U.S. 914 (1969); United States ex rel. Maselli v. Reincke, 383 F.2d 129, 132 (2 Cir. 1967); United States ex rel. Boucher v. Reincke, 341 F.2d 977, 981–82 (2 Cir. 1965); United States v. Horton, 334 F.2d 153, 155 (2 Cir. 1964); United States v. Garguilo, 324 F.2d 795, 796–97 (2 Cir. 1963); United States v. Gonzalez, 321 F.2d 638, 639 (2 Cir. 1963); United States v. Wight, 176 F.2d 376, 379 (2 Cir. 1949), cert. denied, 338 U.S. 950 (1950).

■ The stringent requirements to which we continue to adhere for establishing inadequacy of counsel were well articulated by Judge Smith nearly 23 years ago in United States v. Wight, supra, 176 F.2d at 379:

"Moreover, time consumed in oral discussion and legal research is not the crucial test of the effectiveness of the assistance of counsel. The proof of the efficiency of such assistance lies in the character of the resultant proceedings, and unless the purported representation by counsel was such as to make the trial a farce and a mockery of justice, mere allegations of incompetency or inefficiency of counsel will not ordinarily suffice as grounds for the issuance of a writ of habeas corpus. . . . (citations omitted).

A lack of effective assistance of counsel must be of such a kind as to shock the conscience of the Court and make the proceedings a farce and mockery of justice. . . . (citations omitted)."

In substance, these are the standards which we uniformly have followed ever since—expressed in various ways. For example, "[e]rrorless counsel is not required, and before we may vacate a conviction there must be a 'total failure to present the cause of the accused in any fundamental respect.'" United States v. Garguilo, supra, 324 F.2d at 796, quoting from Brubaker v. Dickson, 310 F.2d 30, 39 (9 Cir. 1962), cert. denied, 372 U.S. 978 (1963). Further, "for there to be a lack of compliance with the fundamental fairness essential to due process, counsel's representation must be so 'horribly inept' as to amount to 'a breach of his legal duty faithfully to represent his client's interests.'" United States ex rel. Scott v. Mancusi, supra, 429 F.2d at 109, quoting from United States ex rel. Maselli v. Reincke, supra, 383 F.2d at 132, which in turn quoted from Kennedy v. United States, 259 F.2d 883, 886 (5 Cir. 1958), cert. denied, 359 U.S. 994 (1959). And, most recently, "[r]elief may only be obtained when representation has been so woefully inadequate 'as to shock the conscience of the Court and make the proceedings a farce and mock-

---

age 14 at Catholic Charities, and the testimony of his counsel denying receiving any such information. We do not consider the Catholic Charities examination of sufficient relevance to warrant discussion here; it took place some eleven years before the crime here involved and disclosed that petitioner at that earlier period had been involved in truancy, theft, heterosexual and homosexual activity, and "cross-dressing."

ery of justice.'" United States v. Currier, *supra,* 405 F.2d at 1043, quoting from United States v. Wight, *supra,* 176 F.2d at 379.

Applying these standards to the instant case, petitioner's claim of alleged inadequacy of counsel, viewed in the light most favorable to petitioner, may be summarized as follows. His counsel knew that petitioner, charged with first degree murder, faced a possible sentence of capital punishment under then existing New York law. They also knew that the people's case was a virtually airtight one, including the testimony of six or seven eye witnesses that petitioner indeed had shot Jacqueline Bonds.[11] They were confronted with an uncooperative client who, aside from doggedly professing his innocence, adamantly refused to communicate with his counsel. They were aware of the two psychiatric examinations, conducted at their request in August and October 1963, to determine petitioner's competence to stand trial; and they knew of the earlier one made by the Department of Correction in connection with the charges for which he had been indicted on April 5, 1963.

The combination of these circumstances, it plausibly may be argued, should have alerted petitioner's counsel to look into a possible insanity defense as the only way to escape conviction. Such investigation, including interviewing the psychiatrists who they knew had examined petitioner and examining the hospital records at Bellevue where they knew he had been committed for 6 weeks during August and September 1963, might reasonably have led—so the argument goes—to petitioner's April 1962 Bellevue admission, just a year before the murder, and the disclosures contained in the record of that admission, e. g. that petitioner had a "paranoid reaction personality". The chief significance of such investigation, had it been conducted, is that it might have produced evidence at trial upon the basis of which it could have been argued that there was a substantial question of petitioner's competence at the time of the commission of the crime, thus placing the burden on the people to prove petitioner's sanity beyond a reasonable doubt. People v. Kelly, 302 N.Y. 512, 515, 99 N.E.2d 552, 553 (1951). This undoubtedly was the idea behind Dr. Wilke's testimony before Judge Metzner, on the basis of petitioner's psychiatric history "not previously presented", that "a possibility of insanity can be entertained."

On the other hand, relying on the other side of the coin of many of these same facts, respondent's position that petitioner was not denied his constitutional right to the effective assistance of counsel may be summarized as follows. Petitioner's counsel were faced with the almost impossible assignment of attempting to defend a client who refused to talk to them and against whom the prosecution's first degree murder case was overwhelming. In evaluating a claim of ineffective assistance of counsel, our Court usually has started by examining the strength of the prosecution's case. United States ex rel. Crispin v. Mancusi, *supra,* 448 F.2d at 234; United States v. Katz, *supra,* 425 F.2d at 930;[12] United States v. Garguilo, *su-*

---

11. Attorney Fusco testified before Judge Metzner that the assistant district attorney "turned over the file to me and showed me in advance of the trial what he had."

12. In *Katz,* Chief Judge Friendly very well summarized this consideration as follows:

"Determination of the effectiveness of counsel cannot be divorced from the factual situation with which he is confronted. When, as here, the prosecution has an overwhelming case based on documents and the testimony of disinterested witnesses, there is not too much the best defense attorney can do. If he simply puts the prosecution to its proof and argues its burden to convince the jury beyond a reasonable doubt, the defendant may think him lacking in aggressiveness, and surely will if conviction occurs. If he decides to flail around and raise a considerable amount of dust, with the inevitable risk that some may settle on his

*pra,* 324 F.2d at 796. Here the overwhelming strength of the prosecution's case against petitioner further exacerbated his total refusal to cooperate or communicate with his counsel. This in turn had the most direct bearing upon trial counsel's failure to learn of the April 1962 admission of petitioner to Bellevue.

For after all, who would be in a better position than petitioner himself to know of his *voluntary* admission to Bellevue a year before the crime for which counsel had been assigned to defend him? Petitioner appears to have been an individual with a mind of his own, as borne out by his adamant insistence upon not taking the witness stand and not pleading to a lesser offense—thus rejecting his counsel's advice in both respects. And yet, despite repeated requests by counsel to petitioner and members of his family for information that would be helpful to his defense, they said nothing about his 1962 Bellevue admission and indeed at no time indicated to counsel the slightest hint of any prior psychiatric history of petitioner. It was upon the initiative of counsel themselves that the court ordered two separate psychiatric examinations of petitioner in August and October 1963. And while the purpose of each of these examinations was to determine competence to stand trial, it does not seem altogether unreasonable for counsel to have assumed that the examining psychiatrists would have discovered and reported symptoms, had there been any, of legal insanity at the time of

the commission of the crime. This is particularly so with respect to the six week commitment of petitioner between August 8 and September 18, 1963 at Bellevue (where of course the records of his April 1962 admission at the same hospital were available). This six week psychiatric examination took place approximately four to five months after commission of the crime.[13] It seems unlikely that the psychiatrists who examined him over this six week period would not have observed something indicating insanity at the time of the commission of the crime while they were examining him on his competence to stand trial. True, the two tests are different but not so different as to impose on counsel, under all the circumstances here disclosed, a duty to request a separate examination as to petitioner's sanity at the time of the commission of the crime.

■ We have weighed with the utmost care the competing arguments of petitioner and respondent—briefly summarized above—upon this issue of alleged denial of effective assistance of counsel by reason of failure to make an investigation to determine whether there was a basis upon which to interpose a defense of legal insanity at the time of commission of the crime. Despite the able presentation by petitioner's counsel in this Court, we conclude that it does not carry the day.

■ Our exhaustive examination of the record of the state court proceedings and of the habeas corpus proceedings in the district court leaves us with the

---

client, the defendant will blame him if the tactic fails, although in the rare event of success the client will rank him with leaders of the bar who have used such methods in some celebrated trials of the past." 425 F.2d at 930.

13. Of course, with the benefit of hindsight, it would have been better to have had a psychiatric examination made closer to the time of the crime and directed at the question of petitioner's sanity at the time of the crime.

But, aside from the psychiatric examination of petitioner made by doctors of

the Department of Correction in April or May 1963, the August-September 1963 examination is the one available which is closest in point of time to the crime here involved. It is six months closer than that reflected by the April 1962 Bellevue admission. And of course it is nine or ten years closer than any examination that would be necessitated by a reversal and remand of this case.

On the recognition of the difficulties inherent in any retrospectve determination of competency (in a different context), see Miranda v. United States, 458 F.2d 1179, 1182 (2 Cir. 1972).

firm conviction that, under all the circumstances, petitioner's representation by counsel in the state court proceedings was not "such as to make the trial a farce and mockery of justice"; nor was there a "total failure to present the cause of the accused in any fundamental respect"; nor was counsel's representation so "horribly inept" as to amount to "a breach of [their] legal duty faithfully to represent [their] client's interests"; nor was counsel's representation so woefully inadequate "as to shock the conscience of the Court". In short, whatever failure there may have been on the part of petitioner's counsel to investigate—if under all the circumstances this can fairly be said to have been a failure at all—we hold that *it did not amount to a failure of constitutional magnitude*. That is the only issue before us and that is all we hold.

Accordingly, we conclude that the district court correctly held that petitioner was not denied his constitutional right to the effective assistance of counsel.[14]

## IV.

■ Petitioner's remaining claims merit only brief mention.

He argues in the alternative that, regardless of whether he was adequately represented by counsel at his state court trial, the district court should have issued a writ of habeas corpus on the ground that he was legally insane at the time of the crime and his conviction therefore was in contravention of the due process clause of the Fourteenth Amendment. We agree with the district court's conclusion that petitioner did not sustain his burden of proof on this issue at the habeas corpus hearing. Johnson v. Zerbst, 304 U. S. 458, 468 (1938).[15]

■ Petitioner also contends, as another facet of his claim of ineffective assistance of counsel, that he furnished to his state court counsel the names of alibi witnesses whose testimony would have supported his contention that he was attending a party at the home of one Jacqueline Valdez on the night of the murder, and that he complained at least 20 times to his counsel about not calling these witnesses.[16] Petitioner's state court counsel flatly denied at the habeas corpus hearing that petitioner ever furnished the names of any wit-

14. In view of our holding that petitioner was not denied effective assistance of counsel, it is not necessary for us to reach the further question whether petitioner established that he was prejudiced by such denial, since a showing of ineffective assistance of counsel does not lead automatically to habeas corpus relief. *See* Note, Effective Assistance of Counsel for the Indigent Defendant, 78 Harv.L.Rev. 1434, 1435 (1965).

The consideration of prejudice in the instant case of course is implicit in our discussion, p. 43, *supra*, of petitioner's claim that under New York law the burden is on the people to prove a defendant's sanity beyond a reasonable doubt. People v. Kelly, *supra*.

15. It should be noted that, as to this issue, Judge Metzner was careful to point out that the mere elapse of substantial time between the state court trial and the habeas corpus hearing did not prevent the court from making a determination on this issue:

"The fact that over six years have elapsed since defendant was tried and

convicted does not of itself preclude a meaningful investigation of the facts and the ability to arrive at a just conclusion. The mere lapse of time does not preclude credible and expert testimony being given after full access to all the prior records, combined with a present personal examination of the defendant. Such testimony can constitute sufficient basis for the court to make a determination."

We recognize of course that the district court's conclusion that petitioner did not sustain his burden of proof on this issue has nothing to do with the issue discussed above under sections II and III of this opinion as to whether trial counsel should have discovered grounds for and interposed a defense of insanity, i. e. whether trial counsel ineffectively prepared the case.

16. Judge Metzner noted in his opinion below the inconsistency in petitioner's position that he was denied the effective assistance of counsel on the one hand because they failed to establish his alibi

nesses who would establish his claimed alibi. Judge Metzner heard and saw the witnesses, including petitioner, who testified before him on this issue. He made careful findings of fact which reflect his appraisal of the credibility of the witnesses who testified. There is no basis for setting aside such findings of fact as clearly erroneous. Fed.R.Civ.P. 52(a). We agree with the district court's conclusion in rejecting this aspect of petitioner's claim of ineffective assistance of counsel.

For the same reasons, we find no error in the district court's rejection of petitioner's claims that evidence was available to his state court counsel of a continuing relationship between petitioner and Jacqueline Bonds up to the eve of the murder; and that he was deprived of his right to testify at his state court trial by the alleged threat of the prosecutor, supposedly made in the presence of petitioner's counsel, that he would see to it that he burned if he testified.

Finally, we find no error in the district court's refusal to appoint an investigator for petitioner at government expense in the habeas corpus proceeding.

In short, having independently examined the complete record of state court proceedings and habeas corpus proceedings in the district court, and having carefully considered each of petitioner's claims in the light of the record, we are satisfied that there is no merit to any of petitioner's claims and that the district court correctly concluded that petitioner is not entitled to the issuance of a writ of habeas corpus.

We express our appreciation to Steven B. Rosenfeld, Esq., petitioner's court appointed counsel in the district court who has continued to represent petitioner on appeal, for his excellent brief and able oral argument in this Court.

Affirmed.

IRVING R. KAUFMAN, Circuit Judge (dissenting):

I find myself in disagreement with my brothers. I am of the view that Marcelin was denied effective or even reasonable assistance of counsel.

The majority opinion, it seems to me, falls prey to the pitfalls of rigid adherence to phrases and formulas which seem to gain strength by ritualistic repetition *in haec verba* in case after case. With the most respect for my brothers, I fear the majority opinion chants the teachings of the timeworn doctrine of this Circuit, but fails to weigh carefully the appropriateness of borrowing the words for application to this case.

We have before us a case where the petitioner was tried for first degree murder—the most serious charge a human being can face. The defense of a murder charge, particularly when the defendant faces the possibility of capital punishment (as did Marcelin), demanded the ultimate in resourceful and dedicated investigation and trial presentation that counsel could muster. Yet, it is distressingly apparent that counsel not only failed to exert that special effort required in a case of such magnitude, but entirely ignored the one glaringly obvious defense that under the bizarre circumstances present here should have sprung at once to counsel's mind. I refer to the defense of insanity at the time the crime was committed.

defense and on the other hand because they failed to raise a defense of insanity:

"One of the court-appointed attorneys who did the actual trial work says that all petitioner ever would say was that 'he didn't do it.' Co-counsel who had been in the case since its inception had the same story to tell. At this point (I will leave the question of whether petitioner furnished the names of witnesses for later discussion), we have an initial inconsistency to deal with. Petitioner maintains until this very moment that he was not physically present when Bonds was killed. At the same time he urges upon the court that he was denied effective assistance of counsel because he claims that they failed to raise a valid and viable defense of insanity. Such a defense assumes, of course, that he committed the act."

My brothers detail the "virtually air-tight" case of the prosecution, but tell us little about the nature of the defense. The fact is that the defense presented only one witness—Susie Borden, an elderly eye witness to the crime whom the state declined to call because of her age and ill health. On direct examination by counsel for the defendant—not the prosecutor—she identified the petitioner as the assailant and in all respects corroborated the testimony of the prosecution witnesses. This defense was indeed strange.

But, in evaluating a claim of ineffective assistance of counsel, we are told, we must begin "by examining the strength of the prosecution's case." The difficulty I find with the majority view is that it both starts and ends with this consideration, with little regard to pertinent and legitimate avenues open to the defense.

I would not suggest, of course, that the failure to interpose a defense of insanity against an overwhelming prosecution case is in every instance, even in most instances, an indication of ineffective assistance of counsel. But this is not a case, as my brothers indicate, where the defense attorneys did the best they could, or put forth even a tolerable effort, in the face of a strong case. *See, e. g.,* United States ex rel. Crispin v. Mancusi, 448 F.2d 233, 234 (2d Cir.), cert. denied, 404 U.S. 967, 92 S.Ct. 346, 30 L.Ed.2d 288 (1971); United States v. Katz, 425 F.2d 928, 930–931 (2d Cir. 1970); United States v. Garguilo, 324 F.2d 795, 796 (2d Cir. 1963). Counsel had good reason to question Marcelin's competency as evidenced by two requests to the court in 1963 for orders requiring psychiatric examinations to determine if Marcelin was competent to stand trial. Although the 1963 examination at Bellevue and the subsequent examination by an independent psychiatrist indicated that Marcelin was without psychosis and competent to stand trial, the Bellevue report clearly stated that Marcelin had a "schizoid personality with sociopathic features."

Given the lawyers' own doubts about Marcelin's competency, which hardly could have been assuaged by these psychiatric reports, it is difficult to comprehend their nearly total failure to conduct any independent investigation. Even the most rudimentary investigation aimed at establishing an insanity defense would have uncovered a voluntary psychiatric admission to Bellevue in 1962—one year before Marcelin shot his girl friend Jacqueline Bonds—where after a commitment of one week it was determined that Marceline suffered from "delusional grandiosity," "suggestions of chronic schizophrenia" and "paranoid reaction personality." That is not all. The lawyers were to discover, but only in time for sentencing, that Marcelin had seen a psychiatrist when he was fourteen years of age.

My brothers would excuse counsel's failure to undertake independent investigation because of Marcelin's exasperating intransigence in totally refusing to aid his defense. But we may safely conclude that counsel's persistent efforts to convince petitioner to plead guilty—as the record reveals—did little to inspire his confidence. In any event, I do not understand my brothers to suggest that an uncooperative defendant waives his right to counsel. *See, e. g.,* Rastrom v. Robbins, 440 F.2d 1251, 1256 (1st Cir. 1971); Jones v. Cunningham, 313 F.2d 347 (4th Cir.), cert. denied, 375 U.S. 832, 84 S.Ct. 42, 11 L.Ed.2d 63 (1963). It would seem to me, however, that Marcelin's eccentric behavior toward counsel, which indeed caused counsel to question the petitioner's competency to stand trial would have led any lawyer of average competence to plead Marcelin's insanity or, at the very least to double his efforts in seeking some evidence of an earlier psychiatric history.

I recognize that a failure by counsel to investigate should lead to a finding of ineffective assistance only if it results in prejudice to the defendant. *See* Coles v. Peyton, 389 F.2d 224, 226 (4th Cir.),

cert. denied, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968); Note, Effective Assistance of Counsel for the Indigent Defendant, 78 Harv.L.Rev. 1434, 1435 (1965). But, in evaluating counsel's performance in this case, I cannot overlook that in New York State once the defendant has raised a substantial question concerning his competence at the time of the crime, the burden is placed squarely on the state to prove the defendant's sanity beyond a reasonable doubt. People v. Kelly, 302 N.Y. 512, 515, 99 N.E.2d 552 (1951).

Accordingly, we cannot ignore the testimony of Dr. Wilke, a court-appointed psychiatrist who examined Marcelin and who testified at the hearing on this petition with the aid of the discovered past psychiatric history that "a possibility of insanity can be entertained." Although it is true that the petitioner has not put forth any evidence which would lead one to conclude beyond a reasonable doubt that he was insane at the time of the crime, this is not the burden he would have been required to carry at the trial. As we have indicated, the burden at the trial would have been on the state to prove that Marcelin was sane beyond a reasonable doubt. In light of the court-appointed psychiatrist's testimony that he entertained the "possibility" of Marcelin's insanity, I do not see how we can stamp our imprimatur on the cavalier and perfunctory defense interposed in this murder trial.

It is also of some interest that despite the overwhelming case presented by the prosecution, the jury deliberated for almost four hours. After two and one-half hours it returned for further instructions on the question of premeditation. Thus, even if I were able to conclude beyond a reasonable doubt that the jury would not have found Marcelin innocent by reason of insanity, I can not conclude that evidence of the past psychiatric history would not have produced a verdict of guilty in a lesser degree than first degree murder.

Bearing in mind that the standards of effective assistance of counsel must be applied with greater stringency in capital cases, Harley v. United States, 100 U.S.App.D.C. 54, 242 F.2d 27 (1957), I find counsel's representation of petitioner nothing less than shocking. I disagree entirely with my brothers' conclusion that counsel did not totally fail to present the cause of the accused in any fundamental respect. Indeed, given the circumstances present here, I am of the view that a neophyte lawyer would not have failed to press the only appropriate defense available to the defendant—insanity. I therefore can come to but one conclusion: counsel exhibited a callousness in investigating and presenting the defense. This rendered the assistance of counsel totally ineffective.

I recognize only too well that we must resist the temptation to analyze trial counsel's performance from the vantage point of 20-20 hindsight. But, we are dealing here not merely with the vagaries of trial tactics, but with pretrial preparation—a step in the process of administering criminal justice where standards of normal competency must prevail. See Brubaker v. Dickson, 310 F.2d 30, 39 (9th Cir. 1962), cert. denied, 372 U.S. 978, 83 S.Ct. 1110, 10 L.Ed.2d 143 (1963); see also Moore v. United States, 432 F.2d 730 (3d Cir. 1970). As with any area of procedural due process, we cannot tolerate the debasement of the judicial process by preoccupation with a correct result regardless of the violence done to a litigant's fundamental rights.