**Yusuf Abdul ALIM a/k/a Albert McQueen, Petitioner,**

v.

**Harold J. SMITH, Superintendent, Attica Correctional Facility, Respondent.**

**No. Civ–76–34.**

United States District Court,
W. D. New York.

March 29, 1979.

Grashow, Greenfield & Palmer, Buffalo, N.Y. (Paul V. Hurley, Buffalo, N.Y., of counsel), for petitioner.

Robert Abrams, Atty. Gen. of the State of New York, New York City (James L. Kennedy, Asst. Atty. Gen., Buffalo, N.Y., of counsel), for respondent.

CURTIN, Chief Judge.

Petitioner has filed an application for habeas corpus relief under 28 U.S.C. § 2254. Permission to proceed in forma pauperis was granted, and Paul V. Hurley, Esq., of Buffalo was assigned to represent petitioner in this matter.

Petitioner was convicted in Supreme Court, Queens County, February 7, 1973, of assault in the second degree, N.Y. Penal Law § 120.05(3); felony weapons possession, N.Y. Penal Law § 265.05; obstructing governmental administration, N.Y. Penal Law § 195.05; and theft of services, N.Y. Penal Law § 165.15. He received a conditional discharge on the misdemeanor convictions (obstructing governmental administration and theft of services). He received concurrent indeterminate sentences of incarceration, not to exceed seven years, on the felony convictions (assault and weapons possession). The conviction was affirmed without opinion by the Appellate Division June 13, 1975. Leave to appeal to the Court of Appeals was denied August 29, 1975.

The petition raises four grounds for relief: that because he did not meet with his counsel until some months after indictment he was deprived of effective assistance of counsel; that he was denied effective assistance of counsel because of joint representation of petitioner and his codefendant; that there was no evidence of an element of second degree assault; and that his right to a fair trial was prejudiced by the prosecutor's inflammatory summation to the jury.

Mr. Hurley was appointed counsel for petitioner on November 22, 1976, and filed an amended petition in January, 1977. Several months were consumed in the filing of pleadings and memoranda of law, culminating in oral arguments which took place on August 23, 1977. After reviewing the records of the underlying criminal proceedings and the legal arguments of the parties, I determined that some form of testimony from petitioner's defense counsel would be required in order to decide petitioner's effective assistance of counsel claim. By my order of May 26, 1978, I ordered respondent to locate petitioner's defense counsel, and by my order of July 25, respondent was ordered to obtain from him an affidavit

setting forth certain facts deemed relevant to this issue. Such affidavit was filed on August 18, with annexed copies of defense counsel's correspondence with petitioner and memoranda concerning court appearances and telephone calls with petitioner. A stipulation was then entered setting forth facts regarding petitioner's first contact with his counsel. This is the key to petitioner's effective assistance of counsel claim, since this claim rests not on counsel's performance at trial but upon his failure to have any actual assistance from counsel during a period of several months prior to trial.

The affidavit and stipulation having been filed, I found the factual record sufficient to obviate the need for a factual hearing, and the case was submitted for judgment in December, 1978.

### The Facts

Petitioner Alim, then known as McQueen, entered a subway station in New York City with codefendant Roberts early one morning in July, 1972. Prosecution witness Mrs. O'Connell, a token vendor, and Patrolman Lozinski, a Transit Authority patrolman, testified that both men passed through the turnstile into the subway system using a single token. This testimony formed the basis for the theft of services conviction.

After passing through the turnstile, they ascended a stairway to another level in the station. Shortly thereafter, petitioner was confronted by Patrolman Lozinski who, according to Lozinski's testimony, accused him of entering without paying and asked him to return to the token vendor's booth. The two men voluntarily accompanied Lozinski back to the vicinity of the booth, where an altercation took place.

Mrs. O'Connell's opportunity to observe this altercation was limited, and her testimony concerning the altercation is inconclusive. Codefendant Roberts and Patrolman Lozinski both offered versions of this incident, which differed greatly.

Roberts testified that Lozinski did not arrest Alim at this point, but began to poke and hit him with his nightstick and at-

tempted to search his pockets. According to this testimony, Lozinski struck Alim in the head with the nightstick, whereupon Alim "pushed" or "grabbed at" the nightstick and "they started tussling." (T. at 155, 168.) Roberts objected and Lozinski struck him in the face with his service revolver. Minutes later, city police arrived and arrested Alim and Roberts.

Patrolman Lozinski's version is essentially as follows: after observing the two men pass through the turnstile together, he followed them upstairs, approached them, and asked them to return downstairs. They returned to the token booth area, but when instructed to buy a new token, Alim refused to do so and began to curse Lozinski. Lozinski asked him to show identification so that Lozinski could write a summons, but Alim refused. He was then told that he was under arrest.

At this point, according to Lozinski's testimony, the five-foot-seven petitioner grabbed the six-foot-one patrolman's nightstick and struck him with it. They struggled and fell to the floor, the patrolman astride Alim with his nightstick across Alim's throat. Roberts approached with a small open knife in his hand and Lozinski, at that moment drawing his revolver in order to "subdue" Alim, struck Roberts across the jaw with the revolver.

The ticket vendor, Mrs. O'Connell, confirms that both men entered the subway using a single token. She further testified that the three men returned to the vicinity of her token booth, where she heard snatches of their conversation. She heard Lozinski ask petitioner to buy another token, heard him refuse, and later heard the word "arrest." She saw petitioner "jump for" Lozinski's nightstick, "hit at" him with it, and saw the two fall to the floor. In sum, she heard only parts of their verbal exchange, did not see what occurred after they fell, and it is uncertain whether she observed all or simply part of what transpired before they fell out of her line of vision. Her testimony corroborates that of Patrolman Lozinski on many issues. How-

ever, it is also consistent with the version of events offered by the defense on several critical issues, e. g., whether Alim actually possessed the nightstick, whether he actually struck Lozinski with it, whether Lozinski was harassing Alim or simply performing his duties (which is material to whether Alim acted with the intent "to prevent a peace officer . . . from performing a lawful duty," as required by N.Y. Penal Law § 120.05(3)), and whether Alim's struggle for control over Lozinski's nightstick was an act of self-defense.

### No Evidence Of An Element Of Second Degree Assault

■ Petitioner argues that there was no evidence that the Transit Authority patrolman he allegedly struck was a "peace officer," which under N.Y. Penal Law § 120.-05(3) is an element of the crime of which he was convicted. This issue has not been raised in the state courts, as required by 28 U.S.C. § 2254(b), and is not properly before this court.

### Effective Assistance of Counsel

Petitioner alleges that he was denied effective assistance of counsel because he did not meet with his attorney and receive legal assistance until shortly before trial. Petitioner was arrested in July, 1972, and was detained in the Men's House of Detention pending grand jury action on his case. At his preliminary hearing, he was represented by Legal Aid. He made a request *pro se* to the District Attorney to be allowed to exercise his right to appear before the grand jury. The District Attorney responded not to the petitioner himself but to Legal Aid, who failed to contact petitioner. On September 19, 1972 he was indicted by the grand jury without having had an opportunity to appear before it and present his case.

He was arraigned on September 21, 1972. At that hearing, Legal Aid indicated that they would be unable to represent petitioner at trial because they would be representing his codefendant, Mr. Roberts. The court nevertheless ordered the Legal Aid

attorney to represent petitioner for purposes of the arraignment. On September 28, 1972, independent counsel was assigned by the court to prepare petitioner's defense and represent him on trial.

Resolving all discrepancies in the record in this action in petitioner's favor, I find that he first consulted with his defense lawyer on January 16, 1973, twenty days prior to the commencement of trial. Petitioner alleges that he was prejudiced by his attorney's inability to contact him (the record indicates that numerous efforts were made to contact petitioner) in that he was prevented from filing a timely motion to dismiss.

■ The record does establish that, perhaps through no fault of any individual attorney, the legal assistance afforded during the initial stages of his criminal proceedings were sub-standard. He was represented by three attorneys in succession, one of whom represented him under protest. This type of arrangement does not promote the thoughtful, conscientious advocacy which a felony defendant should be afforded. In this instance the sporadic nature of the legal assistance provided caused petitioner to forfeit two rights recognized by New York law, the right to appear before the grand jury and the right to make a pretrial motion to dismiss.

As regrettable as the loss of these two procedural rights is, I find that nevertheless this does not constitute a violation of petitioner's constitutionally protected rights. He alleges that these were "critical stages" of the criminal prosecution where he had an absolute right to legal representation. However, as the Supreme Court ruled in *Hamilton v. Alabama*, 368 U.S. 52, 54, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961), "critical stages" are those in which the defendant risks that "[a]vailable defenses may be irretrievably lost." Here the unwilling forfeiture of these two opportunities to contest the sufficiency of the evidence does not prejudice any substantive right of the defendant. The defendant will still have at trial a full opportunity to contest the sufficiency of the evidence and raise all appropriate defenses.

Moreover, my review of the trial transcript in this case convinces me that there was sufficient evidence to merit presenting this case to a jury. Even if Mr. Alim did have a constitutionally protected right to assistance of counsel at those two junctures of the pretrial proceedings where he did not receive adequate legal assistance, assistance of counsel would not have affected the outcome of the trial and the error, if any, was harmless.

The record establishes that petitioner consulted with his trial attorney at least twenty days prior to trial. I find that, given the relative simplicity of the issues presented in this case and the small number of witnesses, a preparation period of this length does not violate the requirement that counsel have adequate time to prepare for trial. *See Powell v. Alabama,* 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *United States ex rel. Bradley v. McMann,* 423 F.2d 656 (2d Cir. 1970).

### Joint Representation

On the second day of petitioner's two-day trial, the judge announced that due to the "indisposition" of codefendant's counsel, both codefendants would be represented by the same counsel. The court clerk indicated for the record that Roberts consented to joint representation. There was no indication that Alim had given consent. The judge did not ask Alim to consent, gave no indication that he had weighed potential conflicts of interest, and did not advise Alim of his right to be represented by separate counsel or ask him if he had any questions or objections to joint representation. (T. at 191.)

The question of whether joint representation violates the Sixth Amendment and mandates habeas corpus relief "involves two essential questions. First, was [petitioner] prejudiced by the joint representation . . . ? Second, did he consent to such joint representation?" *Kaplan v. Bombard,* 573 F.2d 708, 712 (2d Cir. 1978).

The preferred practice is for a judge to conduct an investigation into possible conflicts of interest between defend-

ants, to inform the defendants in some detail of the potential dangers of joint representation, and to elicit a personal indication from each defendant as to whether he or she prefers to have separate counsel. *Id.* at 714–715. Although failure to object to joint representation may be taken to indicate consent, this inference may be drawn only if the defendant has been specifically warned of the possible dangers of joint representation and expressly offered the opportunity to proceed with separate counsel. *Id.* In this case Alim did not personally consent to joint representation. Consent may not be inferred, since there is no evidence that Alim was given the legal advice necessary to make an informed and intelligent consent nor was he given any explicit notice that he could reject the proposed joint representation.

It is somewhat unclear what degree of prejudice is required in order that a violation of this right assume constitutional proportions. In ordinary "inadequate assistance of counsel" cases, the rule in the Second Circuit is that errors in representation do not violate the constitutional rights of a criminal defendant unless "representation has been so woefully inadequate 'as to shock the conscience of the Court and make the proceedings a farce and mockery of justice.'" *United States ex rel. Marcelin v. Mancusi,* 462 F.2d 36, 42–43 (2d Cir. 1972) (citations omitted). It is settled law in this circuit, however, that in federal prosecutions where the judge has failed to conduct a hearing on the propriety of joint representation, any resultant "specific instance of prejudice" or "real conflict of interest" violates the defendant's constitutional rights. *See United States v. Carrigan,* 543 F.2d 1053, 1055 (2d Cir. 1976), and cases cited therein. In *Kaplan, supra,* a habeas corpus action challenging a state conviction, the court relied upon *Carrigan* and other federal cases without distinction, suggesting that in joint representation cases the tests for violation of the Sixth Amendment are the same whether the prosecution occurred in federal or state court. In the recent case of *Salomon v. LaVallee,* 575

F.2d 1051 (1978), however, Judge Feinberg of the Second Circuit indicated that the relevant portions of *Kaplan* were dictum and that the question of whether the standard of "some specific prejudice" is a manifestation of the circuit court's supervisory powers over federal district courts or whether it applies equally to state prosecutions is still an open question.

I believe that this standard is necessary in order to afford meaningful protection to the Sixth Amendment rights of defendants, and applies equally to state and federal criminal trials. The Supreme Court has considered and rejected, in a challenge to a state conviction, the notion that the degree of prejudice resulting from joint representation determines whether a constitutional violation has occurred. *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1977). The Court in that case limited its holding to cases where the attorney involved objected to joint representation, citing *Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942):

> Of equal importance with the duty of the court to see that an accused has the assistance of counsel is its duty to refrain from embarrassing counsel in the defense of an accused *by insisting, or indeed, even suggesting, that counsel undertake to concurrently represent interests which might diverge from those of his first client, when the possibility of that divergence is brought home to the court.*

When, as in this Circuit, the court has an affirmative obligation to conduct a hearing on the propriety of joint representation, and especially when a large part of the trial has already occurred and the testimony received alone should have "brought home to the court" the conflicts of interests inherent in joint representation, whether or not counsel objected to joint representation should not be controlling. Again citing *Glasser*, the Court stated:

> "To determine the precise degree of prejudice sustained [as a result of joint representation] is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and abso-

lute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."

435 U.S. at 488, 98 S.Ct. at 1181. (citations omitted).

█ The logic of *Holloway* and *Glasser* compels adopting the standard of "some specific prejudice" in habeas corpus review of state prosecutions.

█ It is evident that Mr. Alim was prejudiced by this joint representation so casually imposed the second day of trial. Anticipating an attack on the credibility of codefendant Roberts, who had testified, counsel attempted to soften the blow by discussing Roberts' criminal record and character with the jury. Alim had not testified, and his character was not at issue. In commenting on Roberts' character, counsel on several occasions referred to both codefendants when he should have limited his remarks to Roberts. In one instance he implied that both defendants had criminal records (T. at 201), and twice he implied that they were both drug addicts. (T. at 203, 220.) Throughout much of his summation, in fact, he dealt with the culpability of the two men as if this were a single issue and ignored distinctions between the two defendants. Especially in light of the prosecutor's serious efforts to prejudice the jury against codefendant Roberts, this failure to properly distinguish between the two defendants constitutes substantial prejudice which compels me to grant Mr. Alim's habeas corpus relief on the ground of improper joint representation.

### Prosecutorial Misconduct

The prosecutor's summation in this case contains a "host of infirmities" calculated to arouse the "passion and prejudice" of the jurors. *United States v. Gonzalez*, 488 F.2d 833 (2d Cir. 1973). These infirmities fall into three categories: attempts to arouse juror prejudice against Roberts, an admitted transvestite and prostitute; attempts to elicit juror sympathy for or identification with the prosecution witnesses; and comments as to the veracity of witnesses.

The most egregious error was the prosecutor's repeated references to the sexual proclivities of Roberts. Roberts was a transvestite who, as several witnesses testified, was dressed as a woman when the events culminating in his arrest took place. On direct examination he admitted two previous convictions for prostitution, and upon cross-examination he admitted that he sometimes presented himself to his customers as a woman. References to Mr. Roberts' sexual habits appear on almost every page of the summation. The prosecutor attempted to justify this by equating this sexual role reversal with pursuing a career of lying, i. e., because Roberts engaged in prostitution while dressed as a woman, he was a "professional liar." [1] Other times the references were completely gratuitous.[2]

Although it is the cumulative effect of these comments which must be evaluated, there is one particular example which conveys the vituperative tenor of the summation and indicate the extent to which counsel lost sight of acceptable standards of conduct. In an attempt to convince the jury that one might reasonably expect Roberts to carry a knife similar to the one he was charged with possessing, the prosecutor invited the male jurors to imagine their emotions if they had engaged in sexual activities with Mr. Roberts:

> Some of us have been in the Army. There were times when we were far away from home, and we did certain things. Can you imagine how he would have felt if he had picked someone up who he thought to be a girl, and it turns out to be a guy? I've been in the Army. I remember—most of you guys have been in the Army—you remember—to find out that something you just paid ten or twenty dollars for turns out to be a queen bee. You know what you're going to do to that so-and-so, and he knew it, and what did he do? He carried this little poker around to protect himself. "All right, Mr., don't hit me. Don't hit me. All right, I'm a guy." That's what he had this knife for. You know. I know. You've been around, all of you. We've all been around.

T. at 229–230.

As a counterpart to his efforts to activate juror antipathy towards Roberts, the prosecutor attempted to evoke their identification with the prosecution witnesses, particularly Patrolman Lozinski, the main prosecu-

---

1. See the following argument:
   > Now, you all heard Mr. Roberts call her a lier (sic) three or four times, but again if you don't recall that, ask to have it read back. You see, that's the kind of woman who'd lie, and Mr. Roberts—Mr. Roberts, a man that really stands up in society, stand up type of person, a guy that was dressed at six o'clock in the morning at Queensboro Plaza as a lady, a man that admitted that he's been a prostitute for three or four years, and you'd think he's the kind of prostitute that would go after his own kind, but he says, "No, I go after men too. And do you recall that pride when he said, "No one's ever found out—no one's ever found out that I am a man." He was proud of the fact that he could pass himself off as a lady. Terrific. He's a professional liar, and he's proud of the fact that he can lie and convince people, and that's what he's trying to do here.
   > You see, Mrs. O'Connell's a liar. She's a hard working woman, and says that the cop never jibbed him, and I'm using their words. She says that while they were in front of the booth that the cop never jibbed him, but Mrs. O'Connell's a liar, and there's a man that lives by lies, by passing himself off to men.

> Here's a man that prides himself on the fact that he can get away with it. He's a pro at lying. We're going to believe this man's word over Mrs. O'Connell?
> Now, you also heard Mrs. O'Connell say she saw Mr. McQueen grab this stick and force it into the officer's face. Mrs. O'Connell testified to that, but again, Mrs. O'Connell's a liar, and there stands Mr. Virtue, Mr. Roberts, lying. That's what basically this case comes down to.
> T. at 221–223.

2. An incident in which Roberts was pushed against a glass display case in the police station and injured was described as follows:
   > You know why he cut his back. He was probably wearing ladies shoes. If he was over there, he would be wearing panties, so the back of his legs got cut by the glass . .
   > T. at 231.

   These conjectures as to the type of shoes and undergarments worn by the defendant are not only completely immaterial but sheer speculation, not based on facts in evidence.

**62**

tion witness. Referring to an injury allegedly suffered by the patrolman, he asks the jury "Do you want a cop on the street with a pulled groin muscle?" (T. at 228.) He declares elsewhere "[T]hen we get the second part of what happened here, and that's cops mean nothing in this town any more either (sic). If you don't believe it, read around the daily newspapers." (T. at 226.) In the same vein he says "[T]his really offends me. The nerve to accuse cops of manufacturing [evidence]." (T. at 229.)

The prosecutor's errors are not confined to inflammatory remarks and improper bolstering of credibility but also include occasional, and perhaps inadvertent, indications of his personal belief as to the veracity of a witness.[3]

Habeas corpus relief on the ground of prosecutorial misconduct is warranted only if "a prosecutor's remark[s] . . . so infected the trial with unfairness as to make the resulting conviction a denial of due process" or "constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1973). This rule requires first, an evaluation of the likely effect of these comments on the jury, and second, consideration of any factors which might have a mitigating effect.

■ I will assume, for purposes of this decision, that the prosecutor could have legitimately commented on the witness's transvestism and record for prostitution. However, the fact that impeachment on these grounds is permitted does not give the prosecutor free rein to comment at length and without limit. When a prosecutor goes "far beyond the permissible bounds in seeking details" in a permissible area of inquiry, *People v. Jacobs*, 45 A.D.2d 675, 356 N.Y. S.2d 81 (1st Dept.1974), the prejudicial effect on the jury may violate the fundamental fairness required by the Fourteenth Amendment. The state's broad discretion

in fashioning rules of evidence ends where an evidentiary rule adversely affects a defendant's constitutional rights. The question of whether a line of comment is permitted by state law is subordinate to the question of whether it would "so infect the trial with unfairness" as to violate the defendant's rights under the Fourteenth Amendment.

■ It is doubtlessly difficult in some cases for advocates to respect the distinction between making arguments to a jury regarding a witness's credibility and appealing to juror prejudice. In this case, however, the prosecutor's appeals to juror prejudice were deliberate and relentless. His whole summation was a poisonous and vituperative attack on Mr. Roberts, the sole defense witness whose testimony formed the basis for the entire defense strategy. Although prejudicial comments regarding the defendant more often have a serious prejudicial effect on the jury, comments directed at a defense witness may also be so prejudicial as to render the entire trial unfair. *United States v. Drummond*, 481 F.2d 62 (2d Cir. 1973). In this case, where the outcome of the trial depended so heavily on the jury's willingness to believe either Mr. Roberts of Patrolman Lozinski, I find that these repeated attacks seriously prejudiced petitioner's right to a fair trial.

Other factors reinforced the prejudicial effect of these comments, such as the improper bolstering of the testimony and credibility of the patrolman. This type of comment regarding police witnesses has been expressly condemned in *Williams v. Henderson*, 451 F.Supp. 328 (E.D.N.Y.1978) on facts similar to those in the case at bar. *See also United States v. Drummond, supra.* Prejudicial comments also assume greater importance in a brief trial, particularly when the prejudicial summation follows closely the presentation of evidence and affects almost all the evidence presented in the case. *See United States v. White*, 486 F.2d 204 (2d Cir. 1973), *cert. denied* 415 U.S.

---

**3.** See his statement, *supra*, at footnote 1, referring to Roberts as a liar and adding "and that's what he's trying to do here." See also his statement professing belief that cops would not manufacture evidence, *supra* at p. 62.

980, 94 S.Ct. 1569, 39 L.Ed.2d 876, *Williams v. Henderson, supra; cf. United States v. Pfingst,* 477 F.2d 177, 188 (2d Cir. 1973), *cert. denied* 412 U.S. 941, 93 S.Ct. 2779, 37 L.Ed.2d 400. The comments were not ambiguous, *cf. Donnelly v. DeChristoforo, supra,* and not justified by any comments by the defense counsel, *cf. United States v. Ricco,* 549 F.2d 264, 274 (2d Cir. 1977), *cert. denied,* 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389.

No corrective measures were taken which would appreciably diminish the effect of these improper remarks. The trial judge made only two brief interruptions in the prosecutor's summation. (T. at 225, 233.) Even on one occasion when he sustained an objection of improper bolstering of the credibility of a prosecution witness, he did not instruct the jury to disregard the objectionable comment. (T. at 233.) His instructions to the jury contained only a general admonition to arrive at a verdict "calmly . . . and without prejudice." There was no instruction to ignore or put aside the prosecutor's improper remarks, *cf., Donnelly v. DeChristoforo, supra; United States v. Pfingst, supra.* Although I harbor doubts as to whether the deliberateness or inadvertence of the prosecutor's misconduct should play a role where the supervisory role of a circuit court over federal trial courts is not involved, *cf. Williams v. Henderson, supra,* it is clear that in this case the misconduct was an essential part of a trial strategy deliberately embraced by the prosecutor.

In sum, there are no factors mitigating the prejudicial effects of this summation, no factors refuting the inference arising from a reading of the summation that a normal jury would be so affected as to be unlikely to reach a verdict calmly, fairly, and without prejudice.

I find that given the shortness of the trial, the close factual questions and lack of other evidence which gave added importance to the testimony of the two key witnesses, and the other circumstances of this case, this inflammatory summation so infected the trial with unfairness as to require the grant of habeas corpus relief.

Plaintiff's application for habeas corpus relief is granted. The judgment of conviction is vacated and the records of this conviction are ordered expunged.

The usual practice in awarding habeas corpus relief is to order the petitioner released unless within 60 days the state proceeds to retrial. In this case I note that petitioner has almost completed serving his maximum sentence of seven years; two and one-half years were consumed by direct appeal of his conviction, and more than three years have passed since he first filed his federal habeas corpus action. Approximately five months of his sentence now remain. In these circumstances I believe that the usual practice should be modified and that I should not authorize the New York State Department of Correctional Services to retain petitioner in custody for two months while the authorities determine whether a retrial is practical or desirable unless there is good reason. Moreover, Mr. Alim was not in custody prior to and during his trial but had been released on bail. Therefore I order that, unless further proceedings on the original indictment are initiated within 20 days of the filing of this order, the indictment is ordered dismissed with prejudice, and petitioner is ordered released from custody. In the light of petitioner's complaints that certain state-protected pretrial procedural rights were denied him, I leave it to the discretion of the state authorities to determine what proceedings on the indictment would be appropriate, but note that the state's right to retry Alim could be preserved by arranging a prompt bail hearing in the appropriate state forum.

I wish to express to Mr. Hurley, who accepted assignment in this difficult case at my request, my thanks for his patient and persistent efforts on behalf of Mr. Alim.

So ordered.