**UNITED STATES ex rel. Pedro CRISPIN, Petitioner-Appellant,**

v.

**Vincent R. MANCUSI, Warden, Attica State Prison, Attica, New York, Respondent-Appellee.**

**No. 684, Docket 35553.**

United States Court of Appeals, Second Circuit.

Argued Feb. 19, 1971.

Decided July 12, 1971.

Certiorari Denied Nov. 22, 1971. See 92 S.Ct. 346.

**234**

Joel Martin Aurnou, White Plains, N. Y., for appellant.

Steven M. Hochberg, Deputy Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., on the brief), for appellee.

Before LUMBARD, SMITH and FEINBERG, Circuit Judges.

LUMBARD, Circuit Judge:

Pedro Crispin was indicted for robbery in the first degree and convicted of robbery in the second degree in New York County Supreme Court in 1966. On direct appeal, he raised the same two claims now pressed here, that counsel was incompetent and that the pre-trial identifications were impermissibly suggestive. After his claims were rejected, 30 A.D.2d 935, 1 Dept.1968, cert. denied, Crispin v. New York, 396 U.S. 851, 90 S.Ct. 109, 24 L.Ed.2d 100 (1969), he brought this habeas corpus action in the Southern District of New York. Judge Murphy denied Crispin's petition without a hearing. We affirm.

Only the first issue, the alleged ineffective assistance of counsel, need concern us. Crispin was represented by an attorney from the Legal Aid Society, Mrs. Rae Selwyn. In evaluating this contention, we start by examining the strength of the prosecution's case. If that case is overwhelming, there may be little that defense counsel can do, and counsel will very likely be faulted by the dissatisfied client either for doing too much or too little. United States v. Katz, 425 F.2d 928, 930 (2d Cir. 1970).

The government's case against Pedro Crispin was very strong. The sequence of events it sought to establish in support of the charge of first degree robbery was as follows: The victim, Mrs. Pagan, entered the elevator in the lobby of her building and pressed the button for her floor, the seventh. A man on the elevator grabbed her from behind, took her to the sixteenth floor, and then forced her into the staircase. The assailant wrapped a fire hose around her neck and body, grabbed her purse, and then beat her with the nozzle of the fire hose. Ameliano Rosado, the building's caretaker, heard noises and came to the scene. He saw the assailant standing over Mrs. Pagan and beating her. Surprised by Rosado, the attacker turned and made a motion as if to strike him,

at which point Rosado pulled a bulb snatcher from his belt and scared the assailant away. The perpetrator fled down the stairs to the street and disappeared, with Rosado in pursuit. Lawrence Stevenson, a 15-year-old boy, standing at the fifteenth floor landing, witnessed both the assailant and Rosado running downstairs. Going to his window, Stevenson saw the same man rush from the building.

At trial Mrs. Pagan, Mr. Rosado, and Lawrence Stevenson all positively identified Crispin as the assailant. Stevenson also testified that shortly before the attack, he had seen the same man, the defendant, in the elevator. Through the testimony of Mrs. Pagan and Rosado, the prosecution established that the attack was most vicious, and that Mrs. Pagan was seriously and perhaps permanently injured. Finally, a Dr. Wu from Knickerbocker Hospital testified to her condition upon arrival at the hospital. Her eye was swollen and blackened, and she was bleeding from the back of the head and the right side of her forehead. He said the injury to the back of her head could have been caused by a fire hose nozzle.

Faced with such a strong case, it would have been suicide for the defense to rest upon the prosecution's burden to convince the jury beyond a reasonable doubt. So counsel quite properly decided to "flail around and raise a considerable amount of dust, with the inevitable risk that some may settle on his client." *Katz, supra.* The thrust of the argument on this appeal is that Mrs. Selwyn gave incompetent assistance because she settled far more dust on Crispin than the prosecution was able to do. We have read the entire transcript, and conclude that counsel consciously adopted and pursued a three-pronged strategy which in view of the strength of the government's case was not unreasonable and certainly was not incompetent.

The first aim of counsel's attack was to convince the jury that no dangerous weapon was used by the assailant—that Mrs. Pagan really was not hit with a fire nozzle. This was important because, under New York law, the offense of first degree robbery requires use of a dangerous weapon. In the end, counsel's strategy succeeded, because the jury returned a verdict for second degree robbery. Mrs. Selwyn began this line of attack by cross-examination of Mr. Perotti, a building superintendent for the City Housing Authority which administered the victim's apartment building. Perotti admitted that many nozzles are stolen by children. Next, she elicited from Dr. Wu that any blunt instrument could have caused Mrs. Pagan's head injury. In extensive cross-examination of the caretaker, Rosado, counsel established that Rosado first heard a noise like banging against a wall, and then thought he saw the assailant bang Mrs. Pagan's head against the floor, although in the end Rosado conceded he could not be sure what he saw. The defense called five witnesses, all either Housing Authority or city police. Patrolman Browne testified that Mrs. Pagan told him at the time that the assailant struck her in the face, and his investigative report bears the same notation. Patrolman Cade affirmed that Mrs. Pagan said someone punched her in the eye. Cade then investigated the scene of the crime, and did not notice a nozzle. Detective Harley testified that Rosado saw a man standing over the victim beating her. His incident report says he struck her with his hands and feet. Thus, counsel in summation was able to argue successfully that the only testimony regarding the nozzle was Mrs. Pagan's account of an incident in which she was obviously terrified, and when Mrs. Pagan first described what had happened she had not mentioned a nozzle.

Crispin now complains that counsel repeatedly brought out the details of the beating, and thus prejudiced the jury. But this course was necessary in order to show that no nozzle was used, and this was the argument with greatest chance of success. Moreover, after Mrs. Pagan's initial description of the assault, all later characterizations of the

incident by witnesses seemed tame by comparison. While different tactics were possible, that argument falls far short of showing ineffective assistance of counsel. United States v. Gonzalez, 321 F.2d 638 (2d Cir. 1963).

The second aspect of counsel's defense strategy was to try to show that the assailant never took Mrs. Pagan's purse. If Mrs. Selwyn had succeeded, Crispin could only have been convicted on the lesser charge of assault. The strategy ultimately failed, but it is apparent that she had created doubt in the jurors' minds because they asked the court to reread portions of Patrolman Cade's testimony as to what Mrs. Pagan told him concerning her purse.

Counsel began this attack by eliciting from Mrs. Pagan on cross-examination that the first time she mentioned the theft of $37 was when she came to court for the preliminary hearing. Patrolman Browne, testifying for the defense, said he asked Mrs. Pagan at the time if anything was missing, and she did not say that anything was. Patrolman Cade said Mrs. Pagan told him that her purse was missing or taken, but she did not give an intelligible response to his repeated question of what was in it. In summation, counsel argued reasonably enough that Mrs. Pagan lost her purse and just assumed the assailant had grabbed it.

This strategy, too, had its obvious disadvantages, for along with the police officers' testimony came the incident reports, which referred to a robbery. Again, this is the kind of weighing of advantages and drawbacks which counsel must make, and does not show that counsel failed in her duty toward her client.

The third line of attack, and one virtually certain of failure, was to try to convince the jury that all three eyewitnesses were mistaken in their positive identification of petitioner. Crispin now complains that counsel did what the government could not have done under New York's rules of evidence, namely, to introduce pre-trial identifications. But the alternative was to leave the jury with the three witnesses who turned to Crispin and said "that's the man." If counsel's efforts failed, if instead she succeeded in convincing the jury that all descriptions of the assailant given to the police matched each other and fit Crispin, this was the unfortunate result of a valiant effort to sow doubt where none would have existed otherwise. In fact, counsel's efforts clearly did move the jury, for it asked that the entire testimony of Lawrence Stevenson, the 15 year old boy, be reread, and also requested a rereading of testimony concerning Mrs. Pagan's condition at the hospital when Crispin was taken to her room and she failed to identify him.

Mrs. Selwyn tried to show in summation that all three eyewitnesses were mistaken, as follows: Mrs. Pagan, the terrified victim, testified that she did not see the attacker's full face. Hence, her positive identification of Crispin was based on her seeing him in her hospital room three days later. Although she was incoherent at the time, and testified that she did not even remember the confrontation, Crispin's image remained in her mind. Rosado, the caretaker, should not be believed, counsel argued, because he described the attacker after the incident and his description did not include Crispin's most salient characteristics, that is, a mustache, a prominent scar above the eye, and a glass eye or "glassy stare." She was also able to point out minor discrepancies in the description of the assailant's clothing that Rosado gave to various police officers. Although Rosado identified Crispin three days after the crime, counsel urged the jury to consider the possibility of impermissible suggestion. Lawrence Stevenson had identified Crispin the day before and, despite the police officers' denials, perhaps this was mentioned.

The biggest stumbling block to this strategy was Stevenson's testimony. Unlike the others, Stevenson told the police that the man he saw had a scar, a mustache, and a wild look. But with

her arguments as to why Mrs. Pagan and Rosado should not be believed, counsel might have succeeded in convincing the jury that the case rested on the testimony of a 15 year old boy who always watched television and who made up a story in which the typical "bad man" with a mustache, wild stare, and scar is center stage. To buttress this argument, Mrs. Selwyn analyzed Stevenson's testimony to show that it was not worthy of belief. Stevenson said that he first saw the man in the elevator. The man got off at the seventh floor, while Stevenson continued on to the lobby where he picked up the mail and went back in the elevator to the fifteenth floor, arriving there in time to see Crispin fleeing down the stairs. There was only one elevator in operation, and Mrs. Pagan had testified that the man who attacked her was already in the elevator when she got on in the lobby. Hence counsel could ask the jury how, with only one elevator in operation, Stevenson could have seen all these things. Moreover, Stevenson also said that he was on the elevator when Mrs. Pagan was being taken down to the ambulance.

By these means at least counsel was able to suggest a somewhat rational alternative to the jury. As with the other strategies, there were drawbacks. In seeking to show through the testimony of the police that Rosado mentioned nothing about a glass eye or scar, the defense had to suffer through repetition of other essential elements of the description upon which all eyewitnesses consistently agreed: a slim Negro about six feet tall, wearing dark pants and a checkered shirt. But even as to the clothing counsel was able to show some discrepancies in the accounts given. Moreover, she established a variance between the descriptions of the assailant's mustache given by Mrs. Pagan and the other witnesses, which was significant since Mrs. Pagan purported to identify Crispin even though she saw only part of the man's face.

Crispin concedes that the standard for demonstrating inadequacy of counsel is a stringent one. To be entitled to relief, petitioner must show that "the purported representation by counsel was such as to make the trial a farce and a mockery of justice," representation that is so deficient as "to shock the conscience of the Court." United States v. Wight, 176 F.2d 376, 379 (2d Cir. 1949), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950); accord, United States v. Currier, 405 F.2d 1039 (2d Cir.), cert. denied, 395 U.S. 914, 89 S.Ct. 1761, 23 L.Ed.2d 228 (1969). Crispin has fallen far short of the requisite showing. Not only did counsel formulate and pursue several sensible defense strategies simultaneously, as described above, but she also vigorously cross-examined each prosecution witness. That in some respects her strategy may have backfired, or that from hindsight one may think of a better way to have conducted the defense, is not a proper measure of the care and effort Mrs. Selwyn expended upon Pedro Crispin's defense or the effectiveness of her assistance. United States v. Matalon, (2d Cir. 1971), 445 F.2d 1215. In only one respect can counsel properly be faulted. She failed to interview the key witnesses before trial commenced. However, our inquiry is limited to "the character of the resultant proceedings," and counsel clearly overcame the handicap of her initial lack of preparation. See United States v. Wight, *supra.*

Crispin points to several specific instances at trial that he contends demonstrate counsel's incompetence. These are without merit. First Mrs. Selwyn waived her opening statement, but surely this is trivial, and she was acting well within the bounds of competence in waiting to see how the state's case unfolded. See Perrone v. United States, 416 F.2d 464 (2d Cir. 1969). Second, counsel failed to utilize the minutes of the preliminary hearing in cross-examining prosecution witnesses. But Crispin does not say that there were any dis-

crepancies which could have been developed. Third, Crispin contends that his counsel introduced more evidence to identify him than the government had done. As discussed earlier, this was in accordance with a rational strategy.

Petitioner also argues that he should have been allowed to testify. We have recognized that this decision is one of the most difficult to make, and counsel cannot be faulted for her choice. United States v. Garguilo, 324 F.2d 795, 797 (2d Cir. 1963). Furthermore, we need not rely on this generalization here. Crispin had a prior conviction for assault which the prosecution would have been able to show on cross-examination. In a robbery and assault case, naturally, counsel would prefer to avoid disclosure of this fact.

Crispin's petition also asserts that he had an alibi, but that Mrs. Selwyn refused to check it out. Elsewhere in his petition, however, we are told that Mrs. Selwyn later informed him that the supposed alibi witnesses had been arrested and jailed. From this we may infer that she had probed the possibility of alibi testimony. United States v. Gonzalez, 321 F.2d 638 (2d Cir. 1963). Finally, counsel is faulted for not conducting a fuller investigation of the circumstances surrounding the identification of petitioner by Stevenson and Rosado at a ward in Bellevue Hospital. Even assuming that she did not investigate, she had adequate opportunity to prove these identification sessions via the witnesses who testified.

 Crispin's second challenge to his conviction is a contention that his pretrial identification was improper. He alleges that he was singled out in the hospital ward, and that the detectives asked Rosado and Stevenson in a loud voice whether this was the man. We must reject this allegation for two reasons. First, the circumstances surrounding these identifications, as noted above, were fully explored at trial. The record clearly reveals that each witness was brought into a room in which there were 30 to 50 people, many of them black, all dressed in hospital clothes. Stevenson and Rosado separately picked out petitioner without any prompting after they had studied the faces for several minutes. Second, even if we assumed that the identifications were conducted in the manner Crispin now alleges, and even if we assumed that it was impermissibly suggestive, it was not so conducive to irreparable misidentification as to be subject to a due process challenge under Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Each witness had a substantial opportunity to observe petitioner during the crime, and the lineup was conducted in the succeeding few days. United States ex rel. Springle v. Follette (2d Cir. 1970), 435 F.2d 1380; United States ex rel. Phipps v. Follette, 428 F.2d 912 (2d Cir. 1970); United States ex rel. Williams v. LaVallee, 415 F.2d 643 (2d Cir. 1969); United States ex rel. Anderson v. Mancusi, 413 F.2d 1012 (2d Cir. 1969).

We commend assigned counsel, Joel Martin Aurnou, Esq., for his able representation of appellant.