**UNITED STATES of America ex rel. Larry JOHNSON, Petitioner,**

v.

**Leon J. VINCENT, Superintendent of Green Haven Correctional Facility, Stormville, New York, Respondent.**

**No. 73 Civ. 664.**

United States District Court,
S. D. New York.

Jan. 30, 1974.

John J. Tigue, Jr., New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen., State of New York (Constance B. Margolin, Deputy Asst. Atty. Gen., of counsel), for respondent.

## OPINION

BAUMAN, District Judge.

Larry Johnson, currently confined in the Green Haven Correctional Facility, petitions this court for a writ of habeas corpus. On January 23, 1970, he was sentenced by Justice Charles G. Tierney of the Supreme Court, Bronx County, to a term of fifteen years to life after a jury trial in which he was convicted, along with one Boyce Thompson, of murder. His motion for a new trial based on newly discovered evidence was denied by Justice Tierney on November 9, 1971. Both the judgment of conviction and the order denying a new trial were unanimously affirmed, without opinion, by the Appellate Division. People v. Johnson, 38 A.D.2d 689, 327 N.Y.S.2d 545 and 38 A.D.2d 692, 327 N.Y.S.2d 546 (1st Dept. 1971); leave to appeal to the Court of Appeals was denied on January 25, 1972. A second new trial motion, based on substantially the same grounds asserted in the instant petition, was denied by Justice Fein of the Supreme Court, Bronx County, on September 5, 1972 and leave to appeal to the Appellate Division was denied by Justice Steuer on October 31 of that year.

After reading the instant petition, I concluded that an evidentiary hearing was warranted. Counsel was assigned, and a two day hearing was held after which further briefs were submitted. What follows constitutes my findings of fact and conclusions of law.

## I.

A brief statement of the facts adduced at the trial before Justice Tierney is necessary to place petitioner's present contentions in context. On December 14, 1968, Johnson, Boyce Thompson, Perry Ford, Cecil Luckie and William Van Hook, also known as Koreem Evans,[1] met one Nicholas Chambers at

---

1. The original indictment, No. 187–69, returned in the Supreme Court, Bronx County, named Johnson, Thompson and Ford only.

Boston Road and 168th Street in the Bronx. The six men then proceeded to the apartment of Linda West Mullins, Ford's common law wife, located at 165th Street and Boston Road. Ford had recently been released from prison and during his incarceration his apartment had been burglarized. Mrs. Mullins apparently suspected Chambers, and had recently told Ford that she had seen someone wearing a coat which she believed belonged to him. It was thus Ford's intention to see whether Mrs. Mullins would identify Chambers as the possessor of the coat.

When they reached the apartment she did so identify Chambers, and Ford immediately accused him of the burglary. Chambers denied it, and was thereupon savagely beaten. The principal damage was apparently inflicted by Ford, although each of the other four participated to some degree.[2] After Chambers had been knocked more or less senseless, Van Hook and Luckie were told to go downstairs. As they were descending the stairs from the fourth floor apartment, the two men saw Johnson, Thompson, and Ford carrying Chambers up the next flight of stairs, apparently toward the roof.

There was a significant hiatus in the state's case at this juncture; it presented no eye witness testimony of what transpired on the roof. Mrs. Mullins testified that Ford returned to the apartment fifteen to twenty minutes later and informed her that he had just thrown Chambers off the roof. Luckie and Van Hook testified that they waited outside the apartment building until Thompson came down and showed them Chambers' body lying in an alley beside the building. Thompson, testifying on his own behalf, stated that as the four men reached the landing between the fourth and fifth floors, Johnson turned and went downstairs. When Thompson

started to do likewise, his account continues, Ford pulled a gun and ordered him to continue upwards. On the roof, according to Thompson, Ford and Chambers started fighting, and at some point Ford "punched the guy and he fell off the roof."

Both Johnson and Thompson were found guilty of murder, and both were given sentences of fifteen years to life. Ford, who had previously pleaded guilty, was sentenced to a term of twenty years.

## II.

Johnson has presented two arguments in support of his petition. First, he contends that the prosecution violated his rights secured by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed.2d 215 (1963), by failing to disclose exculpatory information to his trial counsel. More specifically, he alleges that Irvin J. Goldsmith, the Assistant District Attorney in charge of the prosecution, was told by Perry Ford in an interview in October, 1969, several weeks before the trial, that the petitioner had not been on the roof when Chambers fell off. This information, it is contended, was never communicated to Mary Johnson Lowe, petitioner's trial counsel, who consequently did not summon Ford to testify at trial. Second, petitioner contends that the trial court erroneously failed to submit to the jury the lesser offenses included within the crime of murder. Petitioner argues that this failure was in itself a violation of due process; in addition, however, he argues that the failure of his assigned counsel to raise this point on appeal violated his right to counsel secured by the Sixth Amendment.

## III.

Resolution of the first of these contentions requires a threshold determination of credibility. At the hearing held

---

2. Cecil Luckie and William Van Hook, the state's principal witnesses at the trial, were apparently little more than disinterested observers. They did not know Chambers, bore no grudge against him, and, according to their own (uncontradicted) testimony, did not participate in the beating until Johnson drew a gun and announced that everyone had to be involved, "so nobody could squeal."

before me, Perry Ford testified that in October, 1969, he was brought to the Bronx County Courthouse and thereafter delivered to Irvin Goldsmith's office. During this interview, which took place outside the presence of his assigned counsel, Ford told Goldsmith his version of the events of December 14, 1968, namely, that Johnson did not accompany him to the roof of the building, and was in no way implicated in the fall of Chambers from the roof. Ford also testified that Goldsmith was dissatisfied with this account, stated that he was not "helping himself" with such a story, and that there would be no recommendation of a lenient sentence if Ford adhered to it. Ford also testified that he endeavored to communicate this version to Mrs. Lowe, petitioner's trial counsel, and there was introduced in evidence a letter from Ford to petitioner's wife, to be forwarded to Mrs. Lowe, containing Ford's version of the crime substantially as he had testified. The letter, however, was dated February 4, 1970 and was thus too late to be of use at the trial.

When called to testify at the hearing in the case at bar, Mr. Goldsmith denied that any such meeting had taken place. I accept this testimony, not merely because I found Goldsmith, who is First Assistant District Attorney and Chief of the Homicide Bureau of Bronx County, a credible witness, but also because the available evidence regarding the practices of the District Attorney's office supports his account. First, Goldsmith testified that he never interviewed a defendant in a criminal case outside the presence of that defendant's lawyer as well as a police officer. Ford, however, testified that he met Goldsmith alone. Second, Goldsmith's diary bore no entry of such a meeting. Third, Goldsmith testified that a defendant cannot be brought to the District Attorney's offices without some form of court order. No such order is contained in the Ford case folder. Goldsmith's testimony is further buttressed by the affidavit of Noah Braunstein, Ford's assigned counsel, stating that he is unaware that Ford ever discussed his case with Goldsmith outside his presence and has no information of such an event ever having transpired.

■ On balance, then, Goldsmith's testimony is the more plausible. To accept Ford's account would be to believe that there were three significant departures from the unvarying practices of the District Attorney's office: the interview of a defendant by a prosecutor without his lawyer, the interview of a defendant by a prosecutor without a police officer, and the delivery of a defendant to a prosecutor without a court order. I am unwilling to assume that an experienced and obviously competent prosecutor would sanction such departures. I find the testimony of Goldsmith was honestly given and, as I have stated, fully credible. I further find that no meeting ever took place between Ford and Goldsmith, and consequently that the prosecution withheld no exculpatory evidence in violation of its obligations under *Brady*.[3]

### IV.

Petitioner's second contention raises a vastly more difficult problem. In order to discharge my obligations with respect to the petition I am required at the outset to ascertain the applicable state law. With all respect for the learned members of the state court bench, it seems clear that under their decisions the trial court erred in failing to charge the lesser included offenses.

People v. Mussenden, 308 N.Y. 558, 127 N.E.2d 551 (1955), contains the standard formulation of the doctrine of

3. It should also be noted that the force of petitioner's argument here is further diminished by Mrs. Lowe's admission that she was aware, at the time of the trial, of the substance of Ford's account of Chambers' death. She therefore made some attempt to interview Ford prior to trial, but Braunstein, Ford's counsel, steadfastly refused to permit her access to Ford. Never having spoken to Ford, she thus chose not to call him as a defense witness at trial.

lesser included offenses. Judge Fuld, speaking for the Court of Appeals, stated the doctrine in the following manner:

"It has been repeatedly written that if, upon any view of the facts, a defendant could properly be found guilty of a lesser degree or an included crime, the trial judge must submit such lower offense . . . . And it does not matter how strongly the evidence points to guilt of the crime charged in the indictment, or how unreasonable it would be, as a court may appraise the weight of the evidence, to acquit of that crime and convict of the less serious." 308 N.Y. at 562, 127 N.E.2d at 553.

The court added one qualification to this principle:

"The submission of a lesser degree or an included crime is justified only where there is some basis in the evidence for finding the accused innocent of the higher crime, and yet guilty of the lower one . . . . The trial court may not, however, permit the jury to choose between the crime charged and some lesser offense where the evidence essential to support a verdict of guilt of the latter necessarily proves guilt of the greater crime as well." 308 N.Y. at 563, 127 N.E.2d at 554.

The holding of Mussenden has been codified in C.P.L. § 300.50 [4] and widely followed subsequently. See, e. g., People v. Asan, 22 N.Y.2d 526, 293 N.Y.S.2d 326, 239 N.E.2d 913 (1968); People v. Usher, 39 A.D.2d 459, 336 N.Y.S.2d 935 (4th Dept. 1972); People v. Calhoun, 20 A.D.2d 528, 245 N.Y.S.2d 248 (1st Dept. 1963). Indeed, the New York Court of Appeals has gone so far as to hold that "the conditions are exceptional" where a "refusal to instruct the jury as to their power to convict of a lower degree" is warranted. People v. Malave, 21 N.Y.2d 26, 286 N.Y.S.2d 245, 233 N.E.2d 269 (1967); People v. Schleiman, 197 N.Y. 383, 90 N.E. 950 (1910); People v. Richardson, 36 A.D.2d 25, 319 N.Y.S.2d 351 (4th Dept. 1971).

■ Applying the doctrine to the facts before me, I am convinced both that petitioner's trial counsel made the necessary request for the submission of an assault charge to the jury, as § 300.-50 requires, and that the trial court's denial was without legal justification. A fair reading of the colloquy between court and counsel, set out in the margin,[5] suggests that Mrs. Lowe did

---

4. C.P.L. § 300.50:
"1. In submitting a count of an indictment to the jury, the court in its discretion may, in addition to submitting the greatest offense which it is required to submit, submit in the alternative any lesser included offense if there is a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater. If there is no reasonable view of the evidence which would support such a finding, the court may not submit such lesser offense. Any error respecting such submission, however, is waived by the defendant unless he objects thereto before the jury retires to deliberate.
2. If the court is authorized by subdivision one to submit a lesser included offense and is requested by either party to do so, it must do so. In the absence of such a request, the court's failure to submit such offense does not constitute error.
3. The principles prescribed in subdivisions one and two apply equally where the lesser included offense is specifically charged in another count of the indictment.

4. Whenever the court submits two or more offenses in the alternative pursuant to this section, it must instruct the jury that it may render a verdict of guilty with respect to any one of such offenses, depending upon its findings of fact, but that it may not render a verdict of guilty with respect to more than one. A verdict of guilty of any such offense is not deemed an acquittal of any lesser offense submitted, but is deemed an acquittal of every greater offense submitted."

5. "MRS. LOWE: Now, I also take exception to the charge of the Court when it referred to the intent and the common enterprise, it did not clearly state to this jury that they could not consider that the intent that resulted in the assault upon the deceased in the apartment or the common enterprise that may have given rise to the assault on the deceased in the apartment is the intent and common enterprise that must be found to convict these defendants of murder and in view of the fact that there is a—there is very strong proof that the defendants did

request a charge of assault, and that the court declined this request because it felt that the crime of assault "merged" into that of murder. Read most charitably, the court's remarks suggest that it concluded that the case fell within the *Mussenden* exception, and that the jury could not have found the petitioner guilty of assault without finding him guilty of murder as well. With all deference, I must conclude that the court was in error. The jury could have believed the testimony of Van Hook and Luckie that petitioner participated in an assault and simultaneously accepted Thompson's account of Chambers' death, which exonerated the petitioner. The *Mussenden* exception is thus inapplicable, for it applies only where a finding of guilt on the lesser included offense necessarily implies a finding of guilt on the greater.

Justice Tierney thus disregarded the settled rule, enunciated in *Mussenden* and elsewhere, that a refusal to charge a lesser included offense is justifiable only where *there is no possible view of the facts* which permits the jury to find such an offense. The facts developed at the trial most assuredly support a jury finding of the crime of assault, and petitioner was thus entitled to such an instruction.

It is generally recognized, however, that habeas corpus does not lie to set aside a conviction based on improper jury instructions, save upon a clear showing that the errors complained of were so egregious as to constitute a denial of due process. Young v. State of Alabama, 443 F.2d 854 (5th Cir. 1971); United States ex rel. Mintzer v. Dros, 403 F.2d 42 (2nd Cir. 1968); Galloway v. Burke, 297 F.Supp. 624 (E.D.Wis. 1969); Auger v. Swenson, 302 F.Supp. 1131 (W.D.Mo.1969). The failure to charge lesser included offenses has not, on the whole, been deemed sufficiently flagrant. Poulson v. Turner, 359 F.2d 588 (10th Cir.), cert. denied, 385 U.S. 905, 87 S.Ct. 219, 17 L.Ed.2d 136 (1966); Wade v. Yeager, 245 F.Supp. 67 (D.N.J.1965).

Given the foregoing propositions, one serious question only remains: was the failure of petitioner's assigned counsel to raise on appeal the issue of the trial court's erroneous charge so outrageous as to deny petitioner the effective assistance of counsel? The answer depends upon a careful consideration of the available precedents and of the evidence developed at the hearing.

Petitioner was not represented on appeal by Mrs. Lowe, whose competence is beyond question. He was instead repre-

---

engage in an assault pursuant to a common enterprise to find out from Chambers where the coat—where the things that were stolen from Ford's apartment, that that intent and that enterprise is not the intent and enterprise that is a requisite for finding guilt of murder and I believe the jury does not understand that and I request the Court to charge the jury clearly that the intent necessary to act in concert to find out where Larry—where Perry Ford's clothing was and the result of the assault on Chambers inside that apartment should be clearly distinguished from an acting in concert for the purpose of murdering Perry Ford—I mean murdering Nicholas Chambers.

THE COURT: In summarizing the evidence, the Court summarized the testimony of all the witnesses and that is the testimony that is the evidence which this jury will deliberate upon and whatever occurred in the apartment prior to the time they left the apartment and started upstairs surely was an assault but all of that is merged in this circumstantial evidence and intent of the whole proceeding from beginning to end and it's not like taking separate blocks and putting them all together and charging the separate blocks. You take all the blocks together as the evidence and charge—in charging the one crime. And I'm not going to charge separate counts here of assault because murder in itself is an assault with— and that's what I have before me.

MRS. LOWE: I'm saying that the act that took place in the apartment an act of assault is not the assault that would merge in the homicide—

THE COURT: I decline to charge. First of all, there is no such charge in the indictment. I find anything that occurred prior to what you are talking about is not independent, it's merged in and part of the evidence to spell out intent, circumstantial evidence and the whole ball of wax leading up to acting in concert to commit a crime."

sented by a lawyer who was assigned by the Appellate Division, First Department. That attorney is a 1964 graduate of Columbia Law School and was admitted to the bar in that year. From then until June, 1970, the time of his appointment in the instant case, he was associated with law firms whose practice consisted almost entirely of personal injury litigation. In the course of that practice, he had handled only one appeal. The entirety of his prior exposure to the criminal law consisted of a one semester course at Columbia, and two or three criminal appeals which he had undertaken on appointment. He admitted at the hearing, however, that none of these appeals involved a trial transcript; they were rather undertaken on behalf of prisoners who had entered guilty pleas and who then sought to contest the voluntariness of the plea or the severity of sentence.

In prosecuting petitioner's appeal, the assigned appellate counsel never spoke to his client or to Mrs. Lowe, whom he claimed he was unable to locate. He filed two briefs with the Appellate Division, one from the judgment of conviction, and one from Justice Tierney's denial of his new trial motion, which had been based on Perry Ford's letter to Mrs. Lowe exonerating the petitioner. The brief appealing the denial of the motion was six pages in length; that appealing from the judgment of conviction was ten. Of these ten pages, three were devoted to a statement of facts, and another two to a verbatim transcription of Perry Ford's letter, which had not, of course, been admitted in evidence at the trial and was thus not properly before the appellate court. In the remaining five pages, two points were raised: (a) the evidence was insufficient to convict,

and (b) the trial court erred in permitting amendment of the indictment immediately prior to trial. The court's failure to charge lesser included offenses was never raised, quite simply because, as the lawyer testified at the hearing, he was unaware of the doctrine. Although he remembers reading the colloquy set forth at footnote 5, supra, he utterly failed to grasp its import. The issue was thus never raised by him on petitioner's direct appeal; although petitioner attempted to raise it in his new trial motion submitted to Justice Fein, the court ruled that not having been raised on appeal, the point could not be the subject of post-conviction relief.

The handling of the appeal was manifestly inadequate, but was it so inadequate as to deny petitioner the effective assistance of counsel? The prevailing standard in this Circuit was first enunciated in United States v. Wight, 176 F. 2d 376 (2nd Cir. 1949), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950). In order to infringe the Constitution, "[a] lack of effective assistance of counsel must be of such a kind as to shock the conscience of the court and make the proceedings a farce and mockery of justice." [6]

That standard provides little or no assistance in evaluating concrete cases. The use of the "shock the conscience test" in giving scope and content to the Due Process Clause was long a particular object of Justice Black's scorn,[7] but it appears to survive unimpaired in this remote pocket of constitutional law. If the general standard is of little use, it is then necessary to examine how that standard has been applied in recent years by our Court of Appeals. As I see it, the cases in which the court has considered ineffective assistance claims are

6. This test has a wide following. See, e. g., McMillan v. New Jersey, 408 F.2d 1375 (3rd Cir. 1969); Davis v. Bomar, 344 F.2d 84 (6th Cir.), cert. denied, 382 U.S. 883, 86 S. Ct. 177, 15 L.Ed.2d 124 (1965); Audett v. United States, 265 F.2d 837 (9th Cir.), cert. denied, 361 U.S. 815, 80 S.Ct. 54, 4 L.Ed.2d 62 (1959). But see Scott v. United States, 138 U.S.App.D.C. 339, 427 F.2d 609 (1970).

7. See, e. g., Adamson v. California, 332 U.S. 46, 68, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947); Rochin v. California, 342 U.S. 165, 174, 72 S.Ct. 205, 96 L.Ed. 183 (1952); Griswold v. Connecticut, 381 U.S. 479, 507, 85 S.Ct. 328, 13 L.Ed.2d 339 (1965) (Black, J., dissenting); and Black, A Constitutional Faith, chapter 2 (New York, 1969).

divisible into three categories: (1) those cases in which the court has examined the performance of counsel and found no ineptitude; (2) those where the court has found ineptitude, but concluded that it did not rise to the "farce and mockery" level; and, (3) not surprisingly the smallest category, those cases in which the court has found the ineptitude sufficiently shocking as to constitute a deprivation of the right to counsel. I shall briefly examine each of these categories in turn.

In the first category are cases in which the petitioner quarrels with the trial tactics adopted by his lawyer; typically, they allege the failure to call or interview certain witnesses,[8] the adoption or rejection of a particular line of defense,[9] the failure to put the defendant on the witness stand,[10] or the failure to investigate certain leads.[11] Such cases have consistently held that the choice of trial tactics, even if erroneous in retrospect, does not constitute ineffective assistance of counsel. The other broad class of cases in this first category consists of those in which the decisions of counsel were fully justified by the evidence developed at trial or the underlying circumstances of the case. Among such cases are one in which counsel's advice to plead guilty was deemed justified by the court in light of the government's case against the defendant,[12] or another in which counsel's failure to request a suppression hearing or a hearing on electronic surveillance was deemed justified in view of the obvious inefficacy of such motions.[13] The ineptitude there lies not with the lawyer, but with a client unable to comprehend fully adequate representation.

The second class consists of cases in which the court has found the behavior of counsel inept but not "shocking." These are less susceptible of generalization, for they involve both errors of law and of judgment. In United States ex rel. Scott v. Mancusi, 429 F.2d 104 (2nd Cir. 1970), cert. denied, 402 U.S. 909, 91 S.Ct. 1385, 28 L.Ed.2d 651 (1971), petitioner entered a plea of guilty upon his counsel's advice that New York law permitted withdrawal of a guilty plea as of right. Although the court acknowledged that this advice was incorrect, it demonstrated no "horrible ineptitude." In United States v. Matalon, 445 F.2d 1215 (2nd Cir.), cert. denied, 404 U.S. 853, 92 S.Ct. 92, 30 L.Ed.2d 93 (1971), appellant based his claim of ineffectiveness on his counsel's decision to call seven character witnesses, each of whom was impeached with evidence of the appellant's prior criminal record. Had these witnesses not been called, such history could not have been introduced. While the decision to call one such witness could have been deemed an erroneous tactic, the court virtually conceded that calling seven in succession was patent stupidity. Nevertheless, this unenlightened performance was not deemed sufficiently "shocking." In United States ex rel. Marcelin v. Mancusi, 462 F.2d 36 (2nd Cir. 1972), cert. denied, 410 U.S. 917, 93 S.Ct. 977, 35 L.Ed.2d 279 (1973), the court held that counsel's failure to explore the possibility of presenting an insanity defense, which was manifestly the only possible effective defense available to the defendant, was not an error of constitutional magnitude. Judge Kaufman dissented, arguing that the charge of murder involved in that case required "the ultimate in resourceful and dedicated presentation" of a defense, and that such presentation had been sadly lacking.

I turn finally to the third category, consisting of those cases in which the

8. United States v. Garguilo, 324 F.2d 795 (2nd Cir. 1963); United States ex rel. Walker v. Henderson, 492 F.2d 1311 (2nd Cir., 1974).

9. United States ex rel. Crispin v. Mancusi, 448 F.2d 233 (2nd Cir.), cert. denied, 404 U.S. 967, 92 S.Ct. 346, 30 L.Ed.2d 288 (1971).

10. United States v. Garguilo, supra.

11. United States ex rel. Walker v. Henderson, supra.

12. United States v. Wight, supra.

13. United States v. Sanchez, 483 F.2d 1052 (2nd Cir. 1973).

argument of ineffective assistance has prevailed. Examples of outright malfeasance appear to come within this category. In Mosher v. LaVallee, 491 F.2d 1346 (2nd Cir. 1974), affirming 351 F.Supp. 1101 (S.D.N.Y.1973), petitioner was told by his counsel that the trial court had promised a sentence of 15 to 16 years if he pleaded guilty. This statement was simply false, and a term of 40 to 60 years was imposed. This was found to be a denial of the effective assistance of counsel.

Misfeasance has, however, upon occasion been of constitutional magnitude. In United States ex rel. Maselli v. Reincke, 383 F.2d 129 (2nd Cir. 1967), affirming 261 F.Supp. 457 (D.Conn. 1966), petitioner's attorney failed to file a notice of appeal, largely, it seems, because he believed that he could successfully negotiate with the state prosecutor for a concurrent sentence on another pending charge. Nor did the attorney inform the petitioner that if indigent, he was entitled to appointment of counsel who would file an appeal on his behalf. Meanwhile, petitioner's co-defendant had appealed, and his conviction was reversed by the Connecticut Supreme Court for insufficiency of evidence. The Second Circuit affirmed the district court's finding that the representation afforded petitioner here was sufficiently inept as to render the proceedings a "farce and mockery of justice." The court stated: "[h]ere, under circumstances suggesting that an appeal would probably, if not certainly, be successful, counsel's conduct effectively deprived Maselli of his right to appeal as well as his right to the assistance of counsel on appeal. This is not a case where hindsight reveals tactical or strategic errors 'over which conscientious attorneys might differ.'" (Citations omitted) 383 F.2d at 132.

It is difficult to differentiate Maselli from the cases in the second category in terms of the competence displayed by the various attorneys involved. What really distinguishes Maselli, I submit, is that in the second category of cases, counsel's ineptitude had no readily identifiable impact on the outcome of the proceedings. In Maselli, on the other hand, the consequences flowing from counsel's inadequacy were causally traceable: the court concluded that petitioner would have obtained a reversal of his conviction but for his lawyer's misfeasance. It would appear, then, that the court, in analyzing claims of Sixth Amendment deprivation, has looked not so much to the quality of the ineptitude as to its discernible consequences. This approach appears to flow from a principle which the court has frequently articulated: "[i]n evaluating a claim of ineffective assistance of counsel, our Court usually has started by examining the strength of the prosecution's case." United States ex rel. Marcelin v. Mancusi, supra, 462 F.2d at 43; United States ex rel. Crispin v. Mancusi, supra; United States v. Garguilo, supra; United States v. Katz, 425 F.2d 928 (2nd Cir. 1970). The weaker the prosecution's case, then, the more likely it is that the misfeasance will attain constitutional significance.

I therefore find myself compelled to conclude that the ineptitude displayed by petitioner's assigned appellate counsel did indeed deprive him of the effective assistance of counsel, in violation of his Sixth Amendment rights. To begin, as the Court of Appeals suggests, with the strength of the prosecution's case, it is plain that the evidence adduced against petitioner was scarcely overwhelming. As I have already noted, the state introduced no direct evidence of petitioner's participation in Chambers' fall from the roof; indeed, it produced no direct evidence of anything that transpired on the roof. The more relevant consideration, however, is the strength of the state's case on appeal. Consequently, this case resembles Maselli in one crucial respect: the petitioner would almost certainly have succeeded in obtaining a reversal of his conviction had it not been for his lawyer's misfeasance. The misfeasance here was not the product of neglect and indifference,

as in *Maselli* but resulted instead from sheer ignorance of the law. I do not however, regard that as a meaningful distinction, for the consequences to the defendants involved were identical.

Some consideration of the *Wight* "shock the conscience" test is perhaps in order at this juncture. I am, in all candor, appalled that the representation of a convicted murderer, facing a minimum of fifteen years in prison, should be entrusted to a lawyer whose acquaintance with criminal law is so slight as to be non-existent. Petitioner's claim comes at a time when the Chief Justice of the United States [14] and the Chief Judge of our circuit [15] and that of the District of Columbia [16] have drawn our attention to the problem of ineffective representation. The Chief Justice in particular has stressed the need for specialized training in trial and appellate advocacy. The assigned appellate counsel, competent though he may be in his chosen field of the law, was lamentably equipped to handle petitioner's case. If we continue to assume that all lawyers are omnicompetent generalists, our criminal courts will doubtless see more such "farces and mockeries of justice" as this.

### V.

■ Because petitioner has only alleged the ineffective assistance of appellate counsel, the granting of the writ must do no more than restore his right to appeal. United States ex rel. Williams v. LaVallee, 487 F.2d 1006 (2nd Cir. 1973). The appropriate procedure, then, is to vacate the judgment of conviction and remand the petitioner for resentencing *nunc pro tunc* upon the verdict already rendered. The petitioner will then have the opportunity to prosecute another appeal. United States ex rel. Thurmond v. Mancusi, 275 F. Supp. 508 (E.D.N.Y.1967); People v.

Hairston, 10 N.Y.2d 92, 217 N.Y.S.2d 77, 176 N.E.2d 90 (1961). The judgment of the Supreme Court, Bronx County, is hereby vacated.

The court wishes to express its thanks to John J. Tigue, Jr., of the New York bar, who discharged his duties as assigned counsel with great credit to himself and the profession.

So ordered.

---

14. Burger, "The Special Skills of Advocacy: Are Specialized Training and Certification of Advocates Essential to Our System of Justice?" 42 Fordham L.Rev. 227 (1973).

15. Kaufman, 170 New York Law Journal No. 90, p. 5 (Dec. 7, 1973).

16. Bazelon, "The Defective Assistance of Counsel", 42 U.Cin.L.Rev. 1 (1973).