**UNITED STATES of America ex rel. William WOODEN, Petitioner,**

v.

**Leon J. VINCENT, Superintendent, Greenhaven Correctional Facility, Stormville, New York, Respondent.**

**No. 73 Civ. 4973.**

United States District Court,
S. D. New York.

July 15, 1974.

---

Kadane & Spizz, Community Legal Assistance Corp., Hempstead, N. Y., for petitioner, by David K. Kadane, Harvey W. Spizz, Malachy T. Mahon, Hempstead, N. Y., of counsel.

Louis J. Lefkowitz, Atty. Gen. of N. Y., for respondent, by Arlene R. Silverman, Asst. Atty. Gen., of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

William Wooden, the petitioner, seeks a writ of habeas corpus to overturn his conviction in the Nassau County Court, on May 18, 1970, after a trial by jury, of Murder, Manslaughter First Degree, Robbery First Degree and Grand Larceny, Third Degree. Wooden was sentenced to concurrent terms, the minimum providing twenty-five years to life imprisonment. The judgment was affirmed without opinion by the Appellate Division, Second Department, 38 A.D.2d 690, 328 N.Y.S.2d 622 (1971) and by the New York State Court of Appeals, 31 N.Y.2d 753, 338 N.Y.S.2d 434, 290 N.E. 2d 436 (1972); and certiorari was denied, 410 U.S. 987, 93 S.Ct. 1517, 36 L. Ed.2d 185. It appears that state remedies have been exhausted within the meaning of Section 2254 of Title 28 U. S.C.

The petition is grounded on two points: (1) that post-indictment, post-arrest statements of petitioner should not have been admitted at trial because they were made at a time when counsel had not yet been appointed for petitioner; and (2) that the trial court should not have forced petitioner to defend himself *pro se*, albeit with two able counsel sitting with him. The memorandum of law submitted by counsel also argues that the petitioner's conviction was improper because of certain evidentiary errors of the trial court. (All of these issues have been considered and will be disposed of in this opinion and order.)

William Wooden was one of four who wantonly killed John Hartel, the station agent at the Long Island Railroad Station in Mineola, New York, on February 18, 1968, and stole some $384.00 from the station. Hartel was shot in the back while opening the ticket agent's booth on that day. After the murder the group fled and the petitioner Wooden made his way to Boston.

On March 12, 1968, the petitioner with his accomplices was indicted by a grand jury in Nassau County.

Some weeks after the indictment, on April 28, 1968, at about 8:00 p. m., two Nassau County patrolmen responded to a report that the A & Z Construction Company burglary alarm had been activated. Arriving at the scene the patrolmen saw the petitioner leaving the building. Patrolman Linwood Gunter recognized the defendant, and knew that there was a warrant for his arrest. The petitioner fled upon seeing the police car but was chased by the patrolman, who finally apprehended him. Patrolman Gunter immediately told petitioner "You don't have to say anything. Anything you say can be used against you in court." The petitioner, who apparently was not ignorant of the procedure, replied, "I know my rights." Patrolman Gunter continued by saying, "You're entitled to have a lawyer at any time and if you can't afford one the County will get you one." To this the petitioner replied, "I don't want a lawyer."

The petitioner was taken by the patrolmen to the 3rd Precinct in Nassau where he was formally "booked". Wood-

en was then taken upstairs to the Detectives' Squad Room. There Detective Lieutenant Guido informed the petitioner that he wanted to question him, advised him that he had already been indicted for murder, and started to advise petitioner of his rights. The petitioner interrupted stating that he knew his rights. Detective Guido, however, said "Well, that's all well and good, but I want to go over them with you so there is no misunderstanding." Detective Lieutenant Guido thereupon recited to petitioner all of the normal "Miranda" warnings. At the end of this recitation Guido told petitioner "Now, I ask you again, knowing your rights, are you willing to talk to us without an attorney being present or without talking to an attorney?" To this the petitioner replied, "Yes . . . I'll talk to you . . . I tried to tell you before."

Thereupon the petitioner told his version of the events of the night of the murder. Basically, the petitioner admitted his participation in the burglary but attempted to exculpate himself from the murder by saying that one of his co-defendants had possession of the weapon used. Detective Lieutenant Guido had Detective Lazorcak type up petitioner's statement. The detectives advised Wooden that they were going to ask "the District Attorney to come in . . ." to which Wooden replied "Yes, bring him in. I'll tell him, too."

Detective Lieutenant Guido left after some fifteen minutes and Detective Lazorcak offered the petitioner some coffee and read to him his rights as set forth on a card that Lazorcak carried. Lazorcak then started questioning the petitioner and typing up the statement as he talked. Sometime thereafter, two other detectives arrived and one of them took over the typing chore. At the completion of the questioning, Wooden reviewed a six page detailed statement, made some corrections and signed the statement.

After the statement was signed, one of the detectives took petitioner into another office where two Assistant District Attorneys and a stenotype reporter were present. Once again Wooden was advised of his rights, including his right to counsel. He stated he knew his rights but he wanted to talk. Once again he gave his version of his implication in the burglary and murder.

At no time during the night of his arrest did the petitioner ask for an attorney although the services of counsel were offered to him on at least four different occasions. There is no claim that any of the confessions or admissions by the petitioner on the night of his arrest were coerced.

At his arraignment petitioner was assigned two defense counsel, as is the custom in New York State cases where murder is charged. Counsel for the defense moved to suppress all of the petitioner's post-indictment statements. The motion was denied and the statements were admitted in evidence at the time of trial.

The statements were "icing on the cake" at the petitioner's trial since one of his co-defendants testified against him and other witnesses told of his admissions to them. For example, Dorothy Greene, whom the petitioner had visited in Boston after the crime, testified that she forced Wooden to leave her home because of a conversation in which he admitted that he had shot someone.

■ In any event, it is claimed that the admission of the petitioner's post-indictment, pre-arraignment statements, made without counsel having been appointed, constitutes a violation of his right to counsel as guaranteed by the United States Constitution, Amendment VI. In support of this argument petitioner relies heavily on Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) which held:

". . . the petitioner was denied the basic protections of that guarantee [of counsel as provided by Amendment VI of the Constitution] when there was used against him at trial evidence of his own incriminating words, which federal agents had

deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206, 84 S.Ct. at 1203.

The petitioner interprets the holding of the United States Supreme Court in *Massiah, supra,* to mean that there can be no waiver of the right to counsel under any circumstances after the initiation of criminal proceedings against a person.

I disagree.

The *Massiah* case must be read in the context in which it arose. There the defendant had already been arraigned and had *retained* counsel when the government surreptitiously obtained the incriminating statements without the presence of counsel. That situation is a far cry from the facts presented by the case at bar, where the petitioner repeatedly refused the assistance of counsel before volunteering his statement.

Furthermore, the simplistic argument advanced by petitioner ignores the growth of the law since the *Massiah* case and particularly the decisions of the Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Both these cases make it abundantly clear that the right to counsel may be waived. Counsel for the petitioner argue that these cases are inapposite since they involved situations where the interrogations took place after the defendants were in custody but prior to indictment. In fact, the argument is made that *Miranda* and *Escobedo* permit a waiver of the right to counsel under the Fifth Amendment but such a waiver may not be permitted under the Sixth Amendment once an indictment has been returned against the defendant. This argument hangs on mere formalism, i. e., that no anti-criminal legal action begins until the return of an indictment. In the real world, governmental anti-criminal action begins when the defendant is first detained. This is the beginning of the entire process and the rights of the defendant must be considered as appertaining at that point rather than waiting for the formal written indictment to be filed. Throughout the process we have a blending of the rights guaranteed by the Fifth and Sixth Amendments, rights which cannot be dissected merely because a formal indictment has been returned. United States v. Drummond, 354 F.2d 132, 150 (2d Cir. 1965), cert. denied, 384 U.S. 1013, 86 S.Ct. 1968, 16 L.Ed.2d 1031 (1966).

The Second Circuit has held

"We are not prepared to hold that Drummond's willingness to go on 'spilling the beans' was a waiver of some of his rights but not others. The Fifth and Sixth Amendments may be designed to protect quite different values but in concrete situations they may often provide precisely the same protection which can be waived in precisely the same way. . . . Drummond could have refused to talk . . .; he would have been protected in such a refusal by the Fifth and Sixth Amendments. But when he *did* elect to speak, his rights under both Amendments were waived."

█ In the situation presented by the case at bar it is clear that the petitioner was offered counsel and was advised of his right to remain silent at least four times, yet, he consciously and knowingly chose to reject the aid of a lawyer. It has been held "that Massiah commands an absolute right to counsel after indictment" but "a clear, explicit, and intelligent waiver may legitimate interrogation without counsel following indictment." United States ex rel. O'Connor v. New Jersey, 405 F.2d 632 (3d Cir. 1969), cert. denied, 395 U.S. 923, 89 S. Ct. 1770, 23 L.Ed.2d 240. Here there was such a clear explicit and intelligent waiver, and therefore no error was made in admitting petitioner's post-indictment statements. In short, the petitioner's argument that the Constitution demands that counsel "must be supplied and not merely offered" at every step in any post-indictment procedure goes far beyond the requirements of the Constitu-

tion. If a defendant, as here, knows of his right to be silent and knows of his right to counsel and intentionally waives those rights his statements thereafter are admissible against him.

The petitioner also attacks his conviction as being in violation of the Sixth Amendment since he was not permitted to choose his own counsel at trial or to change counsel on the eve of trial. After his arrest petitioner was initially assigned Irving A. Cohn, Esq. and Robert Corcoran, Esq. as counsel. After the completion of a "Huntley-Miranda" hearing in December 1969, Charles Brown, Esq. replaced Mr. Corcoran. No complaint was heard from petitioner as to his counsel for over two years between his arrest and the date set for trial. On December 22, 1969, the Court set the petitioner's case for trial subject to the completion of a co-defendant's trial scheduled to start on March 2, 1970. On March 16, 1970, Mr. Cohn and Mr. Brown appeared with the petitioner for trial. For the first time the petitioner announced his displeasure with Mr. Cohn and asked that he be relieved because Mr. Cohn could not communicate with him or protect him. The petitioner also asked that a "Mr. Rivers" be appointed to assist Mr. Brown. Interestingly, the petitioner did not wish to have Mr. Brown relieved, and Mr. Brown applied for a week to ten days adjournment to prepare to become lead counsel.

The trial judge denied the motion of the defendant and of defense counsel Cohn to be relieved.

Selection of a jury began and continued for two days until the morning of March 18, 1970, when Mr. Cohn informed the Court that petitioner had discharged him. Mr. Cohn's application to be relieved was again denied. At this point the defendant made application for the stenographic minutes of the proceedings citing Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). The trial court indicated that the minutes were available.

On the afternoon of March 23, 1970, while the selection of a jury was still in progress, the petitioner again applied to have Mr. Cohn relieved as his counsel. That application was denied.

The jury was finally selected on March 24, 1970. After the jury had been sworn and excused for the afternoon, petitioner applied to the Court to defend himself. The basic reason advanced by the petitioner for his decision is that both of his assigned counsel had talked to him about entering a plea of guilty. The trial judge advised the petitioner that both of his counsel were able, experienced and competent; that they had the opportunity to review the minutes of the trial of petitioner's co-defendant and that, therefore, they could evaluate the case; and finally that the conduct of the trial would be most difficult for the petitioner. The trial judge withheld decision on Wooden's application overnight.

On the following morning, March 25, 1970, Wooden moved to have all witnesses sequestered, specifically asking to have Detective Lazorcak and Detective Hunter removed from the courtroom until they had testified. The motion was granted with the exception that Detective Hunter was permitted to remain to assist the Assistant District Attorney in presenting the case.

The trial judge then concluded that he had no choice but to permit the petitioner to defend himself but he insisted that the two assigned attorneys remain in the courtroom to assist the petitioner. Mr. Cohn at that point moved for a mistrial. The motion was denied and the trial judge satisfied himself that Wooden was supplied with all of the pertinent documents, including the Court-appointed investigator's reports and the minutes of the trial of the petitioner's co-defendant.

The Court then granted an adjournment of the trial until March 30, 1970.

On the morning of March 30, 1970, the petitioner requested another ad-

journment and a copy of "Gilbert's Code and Penal Law". He immediately received the requested book. He stated that he would conduct the trial and look to Mr. Cohn and Mr. Brown for advice when necessary.

The trial was then conducted with the petitioner handling his own defense and conferring with Mr. Brown at intervals during the trial. From time to time the trial judge also assisted Wooden by phrasing questions and otherwise making allowances for him.

From my review of the transcript of the trial and the entire proceedings as reflected in the two volume Record on Appeal to the Appellate Division, Second Department, it is clear that the proceedings were in all respects fair and should not be overturned. Certainly, the proceedings did not ever approach a "sham or mockery of justice" so as to require some action by this Court. United States ex rel. Crispin v. Mancusi, 448 F.2d 233 (2d Cir. 1971).

Petitioner's attack on his court-appointed counsel is directed solely toward Mr. Cohn and completely ignores the fact that he was afforded *two* appointed counsel. He did not at the time, nor does he now, protest the assignment of Mr. Brown. It is true that Mr. Cohn was supposedly "lead counsel" but it is completely clear from the record that Mr. Brown was more than capable of conducting Wooden's defense. Brown had been chief counsel to the Legal Aid Society for a number of years and had had an opportunity to acquaint himself with the facts of the case.

In any event, the attack on Mr. Cohn is without merit. Cohn had represented the petitioner in the "Huntley-Miranda" hearing and did a very creditable job. The complaints against Cohn were all petty in nature, to wit:

(1) Cohn did not read the entire transcript of the co-defendant's trial;

(2) Cohn did not personally visit petitioner often enough;

(3) Cohn did not know the sentence given to petitioner's co-defendant;

(4) Cohn was not aware of plea bargaining on behalf of another of petitioner's co-defendants;

(5) Cohn learned first from petitioner that two of the witnesses against him had been indicted for perjury.

All of these complaints are trivial and none of them, either individually or taken together, is enough to prove that petitioner was denied the effective assistance of counsel.

In his memorandum, petitioner also raises certain alleged evidentiary errors committed at his trial. If these are urged to show that he did not receive a fair trial, then the paucity of alleged error proves just the opposite. In each case the jury was instructed by the trial judge either immediately or in the final charge as to how to consider the evidence. Any error clearly does not rise to constitutional proportions.

The petition for a writ of habeas corpus is denied.

So ordered.